Docket No. 100232.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

*In re* ESTATE OF FLOYD W. FUNK (United States of America, Appellant, v. Patsy Printy, Ex'r, *et al.*, Appellees).

*Opinion filed April 20, 2006.*

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices McMorrow, Fitzgerald, and Kilbride concurred in the judgment and opinion.

Justice Freeman concurred in part and dissented in part, with opinion.

Justice Garman took no part in the decision.

## OPINION

Floyd W. Funk was a truck driver. He died January 7, 1983, leaving a will; a widow; four children, including a minor son; a modest life insurance policy, and interests in farmland, crops and equipment heavily encumbered by loans from the Farmers Home Administration (FmHA), an agency of the United States government. Funk's will named his widow, Patsy Printy, as executor. Shortly after Funk's death, Printy filed a petition in the circuit court of Scott County for admission of the will to probate and issuance of letters

testamentary. See 755 ILCS 5/6–2 (West 2004). The petition was granted, Printy's oath and bond were approved, and letters of office were issued to her on February 14, 1983.

With the assistance of David R. Cherry, an attorney she retained to assist her, Printy commenced the work of disposing of her husband's estate. That work lasted more than two decades. It did not end until December 2, 2003, when the circuit court entered its final order in the case. That order, which was not entered until after Cherry's election as State's Attorney required him to withdraw from the case, was one that Printy could not have foreseen when she agreed to assume her responsibilities on behalf of the estate. It held her personally liable to the United States government for $90,092.66 in payments she had authorized as executor, plus interest. Included in that sum was $38,830.73 which Printy had paid to Cherry for the legal work he performed on the estate's behalf.

The United States appealed, contending that the circuit court's judgment was inadequate because it did not also include a provision requiring Cherry himself to personally surrender to the government the $38,830.73 in disputed attorney fees. The government conceded that Cherry had earned the fees and that they were reasonable. Its contention was simply that it had a superior claim to the money used to pay the fees and that the money should have gone to it rather than Cherry.

The government's claim was rejected by the appellate court, which affirmed the circuit court's judgment over the dissent of one justice. The appellate court subsequently modified its opinion on denial of rehearing, but continued to affirm. 355 Ill. App. 3d 466. The United States then petitioned our court for leave to appeal. 177 Ill. 2d R. 315. We granted the government's petition, and the matter is now before us for review. For the reasons that follow, we affirm in part and reverse in part.

In order to properly evaluate the government's arguments, careful review of the facts is necessary. The pages which follow will therefore relate in considerable detail the specifics of what led to the present appeal. As our discussion will reflect, the executor and her attorney were extremely thorough in undertaking their responsibilities. They withheld nothing from the court. They misrepresented nothing to anyone with an interest in the estate.

The exhaustive records maintained by the executor and her attorney have been critical in guiding our understanding of this case. Those records show precisely what monies flowed in and out of the estate, when financial transactions occurred, the identity of the parties involved, and the purposes for which funds were received or expended. Neither the authenticity nor the accuracy of the documentary record is in question.

The issues presented by this appeal turn on the documentary evidence and on questions of law. With respect to such matters, we are not bound by the views or conclusions of either the circuit or appellate court. Our review is *de novo*. See *Eden Retirement Center, Inc. v. Department of Revenue*, 213 Ill. 2d 273, 284 (2004); *Rosenthal-Collins Group, L.P. v. Reiff*, 321 Ill. App. 3d 683, 687 (2001).

Floyd Funk came from a farming background but became a truck driver to earn a living. He died suddenly of an apparent heart failure while traveling through Wisconsin in 1983. He had just turned 61 years old. Surviving him were Patsy Printy, who was his second wife, and four children. Three of the children, Erle, Joyce and Jana, were issue of Funk's first marriage and had attained their majority. The fourth, Michael, was the issue of Funk's marriage to Printy. He was only 12 and still resided with Printy in the family home.

Funk and Printy were married in 1968. After their marriage, Funk executed a will naming Printy executor of his estate. When Funk died, Printy, acting in her capacity as executor, retained attorney David Cherry to assist her in performing the responsibilities imposed on her by the Probate Act of 1975 (755 ILCS 5/1‒1 *et seq.* (West 2004)). One of those responsibilities was to prepare and present to the circuit court verified accounts of her administration of the estate. 755 ILCS 5/24‒1 (West 2004). Printy filed the first such account on October 11, 1983. That report, which covered the period from February 15, 1983, to October 7, 1983, disclosed that as of the date of Funk's death, the estate's assets consisted of real estate located in Scott County, 250 bales of straw, 150 bales of hay, and various pieces of equipment associated with the operation of a farm, including tractors, plows, augers, wagons, a combine, and a cultivator. Printy subsequently discovered and reported to the circuit court that at the time of his death, Funk was also entitled to a tenant's

share of certain harvested grain and a landlord's share of other harvested grain. In addition, Funk held a life insurance policy from Country Life Insurance Company which paid a benefit to his estate of $28,879.46.

The real estate owned by Funk when he died was the family farm. It consisted of three parcels. The first, referred to as Tract I, consisted of approximately 62 acres and was owned by Funk in fee simple. No other party, including Printy, held an interest in it. The second, designated as Tract II, contained 37.5 acres, while the third, known as Tract III, covered 56 acres. Funk owned an undivided three-fourths interest in Tracts II and III.[1] With respect to the remaining one-fourth interest, he held only a life estate with the remainder in fee simple to his minor son, Michael.

In May of 1980, less than three years before his death, Funk borrowed $205,000 from the FmHA pursuant to the Emergency Agricultural Credit Act of 1978 (7 U.S.C. §1961 *et seq.*) That loan, issued under the government's Economic Emergency loan program, was secured by a 40-year mortgage on all three tracts of his farm, excluding Michael's interest. The mortgage bore only his signature as did the corresponding promissory note.

Pursuant to the terms of the promissory note, Funk was to make 41 annual payments to the FmHA. The first, for $10,000, was due January 1, 1981. The second, for $15,000, was due January 1, 1982. Beginning January 1, 1983, annual installments were to increase to $19,507.

---

[1]Tracts II and III came to be known as such when they were sold at auction. Prior to that time, they were treated as a single parcel known collectively as Tract II. We shall refer to them by their latter designation for purposes of clarity and consistency.

According to the documentary evidence filed with the circuit court, Funk made payments on the promissory note which reduced the principal balance due at the time of his death to $185,000. An additional $23,252.06 in accrued and unpaid interest was also due.[2] Following Funk's death, interest continued to accrue on the loan at the rate of approximately $50.68 per day.

A month after taking out the $205,000 loan secured by the mortgage on his farm, Funk obtained an additional loan from the FmHA pursuant to the Emergency Agricultural Credit Act of 1978 (7 U.S.C. §1961 *et seq*.). The amount of the second loan was $31,000. It was subject to an interest rate of 14% and was to be paid in annual installments over a three-year period. To secure payment of the loan, Funk executed a security agreement and financing statement. The security agreement granted the government, acting through the FmHA, a security interest in crops grown on Funk's farm, in crops grown by Funk on land owned by two other individuals, and in tractors and other farm equipment owned by Funk, subject to purchase money interests held by others on some items of that equipment. At the time of Funk's death, he owed the FmHA $3,322.52 in principal and $495.74 in interest on this loan.

In February of 1981, Funk obtained a third loan from the FmHA pursuant to the Emergency Agricultural Credit Act of 1978 (7 U.S.C. §1961 *et seq*.). The amount of the new loan was $39,290. It had a lower interest rate than the second loan, 13%, and a longer term. It was to be paid in annual installments over a five-year period, with the final payment due on the fifth anniversary of the loan. As with the second loan, Funk executed a security agreement and financing statement. Similar to the previous agreement, the new security agreement granted the government, acting through the FmHA, a

---

[2]Given the interest rate on the note (10%) and the timing of Funk's death, which took place the same week he was to have made his first $19,507 payment, we assume that the bulk of this interest was associated with his failure to make that payment.

security interest in crops grown on Funk's farm, in crops grown by Funk on land owned by other individuals, and in tractors and other farm equipment owned by Funk, subject to purchase money interests held by others on some items of that equipment. Funk made payments on this loan, but still owed $1,782.34 in principal and $262.81 in interest when he passed away.

Funk applied for and obtained a fourth and final loan from the FmHA on April 1, 1982, approximately nine months prior to his death. It was an operating loan issued pursuant to the Consolidated Farm and Rural Development Act (7 U.S.C. §1921 *et seq.*). The loan amount, $44,000, was larger than the second and third loans. It carried a higher interest rate, 14¼%, and a shorter term, just one year.

Unlike the earlier loans, the papers for this transaction were signed by Printy as well as by Funk. As with the previous two loans, a security agreement was executed granting the government, acting through the FmHA, a security interest in crops grown on Funk's farm, in crops grown by Funk on land owned by other individuals, and in tractors and other farm equipment owned by Funk, subject to purchase money interests held by others on some items of that equipment.

The first payment on the fourth and final loan was due the week Funk died and was never made. Funk and Printy therefore still owed the full $44,000 principal amount of the loan plus accrued and unpaid interest of $4,067.65 when he died. Accordingly, of the $114,290 in total loan proceeds Funk received from the second, third and fourth loans between 1980 and 1982, $49,104.86 in principal and $4,826.20 in interest remained unpaid. Under the terms of the respective promissory notes, interest continued to accrue on the unpaid amounts at a combined rate of approximately $19.09 per day.

Pursuant to section 18−1 of the Probate Act (755 ILCS 5/18−1 (West 2004)), the state director of the FmHA filed a claim with Funk's estate for the $185,000 in principal owed under the first loan, the $49,104.86 in principal owed on loans two through four, and the unpaid interest that had accrued and was continuing to accrue under all of the loans. Numerous additional claims were filed by Funk's other creditors. These included unpaid bills for insurance premiums, electricity, equipment and parts, plumbing repairs, oil products, feed,

fertilizer and other items; unpaid loans of more than $80,000 owed to a local bank; money owed the United States for two farm storage facility loans; the balance due on purchase agreements for farm machinery; and outstanding labor charges owed to individuals who helped harvest crops on Funk's land. A report filed with the court on October 22, 1984, calculated the foregoing claims against the estate to be $463,472.76. That sum did not include court costs, taxes, attorney fees or other costs of administration.

Early in the administration of Funk's estate, it became apparent to the executor and the FmHA that at the time of his death, Funk did not have sufficient assets to pay his debts. He had become insolvent, and now his estate was insolvent. One major reason for that was that Funk's farmland was worth significantly less than the debt encumbering it. At the time of Funk's death, the land in Tract I was estimated to be worth only $500 per acre, while Tracts II and III were thought to be worth $1,750 per acre. Using those estimates, the value of Tract I was only $31,000, while the value of Funk's three-fourths interest in Tracts II and III amounted to $122,718.75, for a total value of $153,718.75. An immediate sale of the land would therefore not have yielded sufficient proceeds to cover even the principal balance still due on the mortgage, much less the accrued but unpaid interest.

To help guard against just such a situation, the FmHA had required Funk to assign to "the United States of America, acting through the Farmers Home Administration, United States Department of Agriculture, all of his right, title and interest in and to" certain specified life insurance policies. Unfortunately for the estate and the government, Funk failed to maintain the requisite policies. As a result, no proceeds from the policies were available to help pay off the mortgage when he died.

Given the dire condition in which Funk had left his finances, the FmHA invoked the Federal Insolvency Statute when it submitted its claims against Funk's estate. Cited by the FmHA as "31 U.S.C. 191," the statute was actually amended in 1982, prior to Funk's death, to update its language. Now codified as 31 U.S.C. §3713, the statute has been in force since 1797 without significant modifications. *United States v. Emory*, 314 U.S. 423, 428, 86 L. Ed. 315, 322, 62 S. Ct. 317, 320 (1941). It provides, in pertinent part, that "[a] claim of the United States Government shall be paid first when *** the estate of a

deceased debtor, in the custody of the executor or administrator, is not enough to pay all debts of the debtor." 31 U.S.C. §3713(a) (2000).

Under §3713(a), the United States is entitled to priority with respect to the payment of "debts of the debtor," not debts incurred by the estate. The priority of the federal government is limited to the net proceeds from the property of the deceased after the debts of the estate are paid. Statutory amounts due a widow and a decedent's minor child, funeral and burial expenses, and expenses of administration of the estate are debts of the estate, not debts of the deceased. As a result, the claims of the United States do not take priority over payment for those items. See *In re Estate of Igoe*, 717 S.W.2d 524, 527 (Mo. 1986); *Martin v. Dennett*, 626 P.2d 473, 475 (Utah 1981); *In re Estate of Gleason*, 68–1 U.S. Tax Cas. (CCH) P9416; 21 A.F.T.R.2d (RIA) 1364 (D. Ks. 1968); *United States v. Weisburn*, 48 F. Supp. 393, 397 (E.D. Pa. 1943); *United States v. Hunter*, 5 Mason 229, 26 F. Cas. 439 (Cir. Ct. D. R.I. 1828); 31 Am. Jur. 2d *Executors & Administrators* § 663 (2002).[3]

Priority for payment of claims against the estate is determined by the classification scheme set forth in section 18–10 of the Probate Act of 1975 (755 ILCS 5/18–10 (West 2004)). Under that system, funeral and burial expenses and expenses of administration are included in the first class of claims against the estate. The surviving spouse's or child's award is ranked second. Debts due the United States come third. Four additional categories of claims follow those. Section

---

[3]The reason costs of administration come before claims of the United States and other creditors is a pragmatic one. Administration of the estate is essential for ensuring that all available assets and liabilities are accounted for and that the proper parties receive what they are due. Unless costs of administration are provided for, there can be no assurance that the estate can be administered at all. See *In re Estate of Henke*, 39 Misc. 2d 705, 708, 241 N.Y.S.2d 788, 792 (N.Y. Sur. Ct. 1963).

18–13 of the Probate Act (755 ILCS 5/18–13 (West 2004)) provides that with one exception not relevant here, the representative of the estate is required to pay claims against the estate in order of their classification under this system. See *In re Estate of Brooks*, 134 Ill. App. 3d 993, 994-95 (1985).

The primacy of funeral expenses, expenses of administration, and what the government referred to as the "widow's dower or allowance" was acknowledged by the FmHA at the outset of these proceedings, when it submitted its claim for payment of the balance due on the four loans it had made to Funk before he died. In a letter signed by the FmHA's county supervisor explaining the government's intention to invoke its statutory priority under what is now 31 U.S.C. §3713(a), the government specifically advised Printy that

> "[i]t has been held that debts due the United States and entitled to priority under [the statute] are not payable until after payment of the costs of administration of the estate, widow's dower or allowance, funeral expenses, and state taxes levied on the estate as such ***."

It was against this background that Printy, in her capacity as executor, and Cherry, acting as her attorney, proceeded with the management and disposition of the estate's assets. Because Funk had fallen behind in his mortgage payments for the farm, the government could have initiated foreclosure proceedings. It elected not to do so. Instead, the FmHA considered it more prudent to have the estate continue to operate the farm until Michael, the minor child, attained his majority. Two reasons were given for this decision: (1) the government had instituted a temporary national moratorium against farm foreclosures, and (2) once Michael attained his majority, he could convey his one-fourth interest in Tracts II and III, allowing the property to be sold unencumbered, thereby enhancing its marketability.

With the government's approval, Printy, as executor, assumed control of the farm's operations. Lacking access to cash or loans to finance cultivation and harvesting and not wishing to expose the estate to the risks associated with growing crops, Printy rented the farm to a tenant on a net one-third basis. Under this arrangement, the tenant was to pay all crop expenses and receive two-thirds of the crop. The remaining one-third would be paid to the estate.

At this time, crops harvested from the farm prior to Funk's death remained in storage. Printy arranged for the stored crops to be sold. The sale, which was completed in July of 1983, yielded $64,441.51 in net proceeds for the estate. An additional $35.70 was added to that sum later for additional interest that had accrued before the sale proceeds were distributed. In addition, Printy identified and liquidated two smaller amounts of grain for $1,238.78 and $1,392.83. These sums totaled $67,108.82 and were deposited into the estate's checking account.

With respect to the vehicles and various pieces of farm equipment and machinery owned by Funk at the time of his death, Printy retained Leroy Moss Auction Company to sell them at auction. The auction netted $54,756.25 for the estate, after sales commissions, advertising and labor costs incurred by the auctioneer. That sum was also deposited in the estate's checking account.

The sale of the stored grain was completed in July of 1983. The proceeds from the auction were received in June of 1983. Proceeds from Funk's remaining life insurance policy, noted earlier in this opinion, were deposited in the estate's checking account in March of 1983. Additional moneys were received and deposited at various other times during the year. These included a small refund from FS Credit Corporation on March 5, 2003; an additional payment of $62.79 from the life insurance company on June 8, 1983; $1700.53 from GLH Grain Company on July 22, 1983, for the estate's share of grain harvested on the Funk Farm following Funk's death; and a refund of $87.85 deposited on July 29, 1983, relating to overpayment of advertising charges for the auction.

In addition to receiving and depositing the foregoing sums, Printy made various cash disbursements during the first 10 months the estate was open. Among these were a $10,000 payment to her as a surviving spouse's award and a $2,000 payment to Michael as his surviving child's award pursuant to section 15−1 of the Probate Act (755 ILCS 5/15−1 (West 2004)) on March 9, 1983; payments totaling $108.30 to the Scott County Farm Bureau on May 19, 1983, for membership fees and other charges; $940.49 on June 8, 1983, for real estate taxes; and periodic disbursements to David Cherry for the legal services he performed on behalf of the estate. Cherry's attorney fees totaled $4,239 and were paid as follows: $1,047.50 on March 9,

1983; $1,551 on May 5, 1983; $1,285.50 on July 1, 1983; $169.50 on August 3, 1983; and $186 on September 8, 1983.

The receipts and disbursements just described were detailed in the first report and account filed by Printy, in her capacity as executor, on October 11, 1983. The circuit court approved that account, without objection, in an order filed October 31, 1983.

In the months that followed, discussions took place between Cherry and an assistant United States Attorney assigned to the case to explore the possibility of disposing of the farm before Michael attained his majority. Among the proposals considered by the parties was for the FmHA to foreclose on Funk's interests in the property; to allow the FmHA to take possession of the farm and operate it until Michael turned 18, then sell it; to continue having the executor operate the farm in the context of the probate proceedings and then sell it following Michael's eighteenth birthday; or to bring an action to partition the 93 acres in which Funk had held a three-fourths interest and sell that.

A hearing on various outstanding claims against the estate, including those asserted by the FmHA, was set for late fall of 1984. That hearing was conducted on October 22, 1984, after the requisite notice was given. To assist the court in resolving the outstanding claims, Printy, through Cherry, filed a report on October 22, 1984, detailing the estate's assets and liabilities and listing the outstanding claims against the estate according to their priority under section 18−10 of the Probate Act of 1975 (755 ILCS 5/18−10 (West 2004)). Based on the materials presented at the hearing, the court entered an order denying one claim outright, continuing until another time the hearing on a $6,488.20 claim related to some litigation in which Funk had been involved, and delaying the hearing on the FmHA's claims for repayment of its four loans until a time set by agreement of the parties. Finally, the court considered and allowed a total of $102,857.59 in seventh class claims. Included among these claims was the $80,000 bank loan and the unpaid bills for insurance, electricity, oil products, plumbing repairs and various other items noted earlier in this opinion.

Although the court allowed the seventh class claims, it did not order them to be paid and Printy did not pay them. Because those claims were of a lower priority than other claims which had not yet

been paid, most notably the claims for the expense of administering the estate and those asserted by the United States government, they could not be paid by the executor unless and until there were sufficient funds to first pay off the higher priority claims. See 755 ILCS 5/18–13 (West 2004). That condition was not met at the time Printy filed her report with the court prior to the October hearing. According to that report, the amount of outstanding claims exceeded the value of the estate's assets by an estimated $174,368.84, not including costs of administration, court costs and state and federal tax obligations. As interest on outstanding loans continued to accrue and administration expenses mounted, so too did this deficit.

In November of 1984, Printy filed her second verified report and account under section 24–1 of the Probate Act of 1975 (755 ILCS 5/24–1 (West 2004)) covering the period from the end of the first report until October 25, 1984. That account disclosed that the estate had received $828.76 on July 24, 1984, and $5,435.38 on October 20, 1983, as its share of the proceeds from the sale of new crops grown on Funk's farm, plus an additional $35.70 on February 27, 1984, representing additional interest that had accrued in connection with prior grain sales. The account also reported the following disbursements: $3,055.21 to Carlinville Ford to pay off its secured claim on one of the items that had been sold at the auction in 1983; $324 for crop insurance premiums; $2,415.06 in real estate taxes; $808.67 in federal taxes; $126 for tax preparation; $1,566.03 to Michael Funk for his share of the proceeds from the sale of the new crops grown on the farm; a small check charge to the bank; and a total of $2,269.75 in attorney fees to Cherry, paid in 11 increments between November 7, 1983, and October 5, 1984. In addition, the report and account showed that in June of 1984, Printy, as executor, had placed $130,000 of the cash held by the estate in an interest-bearing certificate of deposit (CD) and that the CD had generated $3,208.68 in interest during that reporting period.

The cash used to purchase the certificate of deposit was derived from the sale of grain following Funk's death and the auction of the farm equipment and machinery the previous year. The decision to place the money in a CD followed numerous letters, calls and meetings in which Cherry, the FmHA, and counsel for the United States Justice Department, representing the FmHA, attempted to work out how the government's claims against the estate could best

be resolved. At each step of the process, the estate kept the court and the government fully advised as to how it was proceeding. The government acknowledged the difficulty posed by the administration of Funk's estate and made no objection to the manner in which matters were being handled by Printy. Indeed, by letter dated April 25, 1984, the government expressly authorized the estate to place the $130,000 in sale and auction proceeds into an interest-bearing account.

A hearing on Printy's second verified report and account was held on November 16, 1984, after requisite notice was given to all claimants, including the FmHA. No objection to that report and account was made, and it was approved by the court. The court also considered a request by the estate to authorize an additional $20,000 payment to Printy for her surviving spouse award and an additional $4,000 payment to Michael for his surviving child award. Finding that proper notice of that request had been given and that no objection had been made, the court approved those amounts.

In accordance with the court's order approving the surviving spouse and child awards, Printy transferred $24,000 from the account in which the sale and auction proceeds had been deposited and made the specified payments. That transfer, which occurred on December 28, 1984, reduced the balance of the CD to $106,000. When the CD subsequently matured on June 28, 1985, the government requested that the proceeds be remitted to the FmHA, through its county supervisor. Printy complied, issuing a check to the FmHA for the full amount of the remaining principal, $106,000, plus an additional $4,000 in accrued interest, for a total of $110,000. The check was transmitted to the FmHA with a cover letter from Cherry dated July 17, 1985.

Upon receipt of the $110,000 payment, the government applied $68,789.48 to pay off the three FmHA loans secured by crops and farm machinery and equipment which Funk had taken out in 1980 (for $31,000), in 1981 (for $39,290) and in 1982 (for $44,000). The FmHA returned the corresponding promissory notes to Printy, as executor, on September 13, 1985. Each note was marked "paid in full."

After the three loans were paid off, the FmHA took the $41,210.52 remaining balance from the estate's $110,000 payment

and applied it to the fourth and final loan, which was secured by the mortgage on Funk's farm. With the additional interest that had accrued on that loan in the years following Funk's death, the balance still due was calculated to be $205,000, exactly the same as the original loan amount.

The $110,000 payment to the FmHA left only a small amount in the estate's checking account. At the time, Cherry estimated the remaining amount to be approximately $9,000, and so advised the FmHA.[4] The government did not object to the estate's retention of that sum. It advised Cherry, however, that it expected the estate to either turn the money over to the FmHA "at some point in time" or else provide the government with an accounting of how the funds were spent.

At the same time the three smaller FmHA loans were paid off, further attention was given by the estate and the government to repayment of the loan secured by the mortgage on the farm. The FmHA ultimately rejected the idea of exercising its right under the mortgage to foreclose and decided against taking over operation of the farm until Michael turned 18. Rather, it chose to maintain the status quo. By agreement with the executor, the estate was to remain open and the executor was to continue operation of the farm until Michael attained his majority, at which time the parties would decide whether the entire farm should be sold or whether the real estate should be partitioned and only the estate's share sold. The agreement further provided that, during the interim, the FmHA was to receive a

---

[4]When the executor received the bank statement for the account, it showed a remaining balance closer to $10,000. There is nothing in the record to suggest that the discrepancy was anything other than inadvertent, and the government does not claim otherwise.

share of the proceeds from the sale of any grain grown on the property.[5]

Following these developments, the estate went on with the business of operating the farm. Printy filed her third verified report and account with the circuit court on March 20, 1986. That document covered the period between October 25, 1984, and the date on which the document was filed. It listed all of the financial transactions that had taken place since the previous report, including the transfer of funds to pay the surviving spouse's and child's awards and the $110,000 payment to the FmHA. The report itemized receipts from the sale of crops, two modest dividends, and interest paid on the certificate of deposit before it matured. It also listed all cash disbursements, including payment to Michael for his share of the crop proceeds and payments to Cherry for the legal services he performed on behalf of the estate. As with past attorney fees, these were disbursed every month or so during the reporting period. Over the course of this reporting period, which was slightly longer than previous ones, 14 attorney fee payments were made ranging in size from $7.50 to $1,220. The total amount of fees was $3,915. The total amount left in the estate's checking account, following all the receipts and disbursements, was $14,406.57. Aside from that checking account, the estate held no other assets except for Funk's farm.

Neither the government nor any other creditor objected to the March 20, 1986, report and account. The FmHA merely sent a letter to Cherry, in his capacity as Printy's attorney, acknowledging the amount of cash on hand listed in the report and requesting that the estate remit to it some of the proceeds from crop sales to be applied to the remaining loan on the farm. Based on the reports and accounts filed by Printy, the FmHA correctly computed that the estate had

---

[5]A proposal to rent the farm to a tenant for cash rather than a share of the harvest was also considered. It offered the prospect of reduced administrative expense and simplified accounting. For reasons not apparent in the record, it was never implemented.

received a total of $7,941.02 from the sale of crops during 1985. The FmHA regarded that as an appropriate minimum payment. The government indicated a desire to receive more than that, but acknowledged that the estate needed to retain "some reserve for payment of taxes, etc." Printy signed a check for $7,941.02 payable to the FmHA, on October 8, 1986, and it was forwarded to the agency by Cherry that same day.

With that payment and the $41,210.52 applied to the farm loan the year before, the estate had paid a total of $49,151.54 toward the mortgage since Funk's death. As indicated earlier in this opinion, Funk was $23,252.06 in arrears when he died. Under the terms of the promissory note secured by the mortgage, three additional payments of $19,507 each should have been made between 1984 and 1986. The arrearage plus the three additional installments due totaled $81,773.06. Even with the payments tendered by the estate, a deficiency of $32,621.52 therefore remained under the loan. It continued to grow each day as additional interest accrued.

Where a loan issued by the Department of Agriculture and administered by the FmHA falls into arrears, Congress has given the Secretary of Agriculture authority to permit the deferral of principal and interest payments upon a showing by the borrower that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments when due without unduly impairing the borrower's standard of living. 7 U.S.C. §1981a (2000). The government is required to give notice to borrowers that such deferral opportunities are available (*Curry v. Block*, 738 F.2d 1556, 1560-61 (11th Cir. 1984)), and such notice was given in this case by letter dated February 18, 1986. By the time that letter was received, the estate was operating under what amounted to a deferral from the FmHA already. As a result, no further action was taken by the estate in response to the notice, and none was required by the FmHA or the Department of Agriculture. The FmHA continued to forebear from foreclosure, and the estate was left with responsibility for operating the farm until Michael turned 18.

During the remainder of 1986 and throughout 1987, little of consequence occurred. Printy's administration of the estate and the estate's operation of the farm were routine. The estate received $6,001.40 in payment for its share of crops harvested from the farm

in 1986 and gave Michael his one-fourth share of that, $1,500.35. With the knowledge and prior approval of the FmHA, it used $700 to pay part of the expense of repairing a division fence, transferred $2,700 to the FmHA to be applied toward the mortgage, and retained the remainder, $1,101.05, for expenses in administration of the estate.

In November of 1986, the FmHA noticed that the real estate taxes on the property had not been paid and asked Printy to take care of it. Records show that the estate made two payments of $748.64 to the county treasurer. The estate also paid a crop insurance premium and continued making periodic payments to Cherry for the estate work he was doing on Printy's behalf. The total amount of the fees for this period was $3,616.23.

Printy's fourth verified report and account, filed with the court on November 12, 1987, covered the period from the end of the previous report through October 26, 1987, and detailed each of the foregoing transactions. To the $14,406.57 in cash on hand at the conclusion of the previous reporting period, the estate added a total of $9,451.41 in additional cash receipts and made $19,827.25 in disbursements, leaving a cash balance of $4,030.73. According to the report and account, that sum, and the estate's interest in the farmland, remained the estate's sole assets.

As with the three prior verified reports and accounts filed by Printy, no objection was filed by the government or any other creditor. Administration of the estate continued without controversy. When 1988 arrived and Michael turned 18, Printy filed a verified petition for leave to sell the farm as previously agreed with the FmHA. A hearing on that petition was held September 19, 1988. There being no objection, the petition was approved by the court in a written order filed October 7, 1988. In accordance with the order, notices were published and a public auction was conducted the following month.

The estate retained Moss Real Estate & Auction Company to handle the auction. As indicated earlier in this opinion, the farm consisted of three tracts. The FmHA submitted the highest and best bid, for $31,000, for Tract I. The highest and best bid for the 37.5 acres in Tract II was the $54,375 offered by Frank and Sandra Grubb.

Clarence and Ruth Baird were the highest and best bidders, at $91,000, for the 56 acres comprising Tract III.[6]

Printy promptly filed reports with the court asking that each of the three sales be approved. She also petitioned the court to award her the sum of $25,000 for her fees as executor of the estate. A hearing on those matters was conducted on January 20, 1989. All required notices having been given and no objections having been made, the court approved each of the sales, authorized Printy to close the sales, and granted her request for an award of $25,000 in executor fees.

At Cherry's request, the FmHA agreed to release its mortgage with respect to Tracts II and III in order to permit the sales to be closed and the property to be conveyed to the new owners. When he submitted the mortgage release to the FmHA, Cherry advised the agency in writing that the proceeds of the sale would be placed in an account for the purpose of paying expenses and making a distribution of the proceeds. Cherry confirmed that, consistent with the provisions of 31 U.S.C. §3713, invoked by the FmHA when it filed its claim against the estate, the government's claim would have priority over all other outstanding claims with the exception of those for expenses of administration. In response, the FmHA executed documents releasing the property from the liens held by the government. The release specified that it did not affect or modify the loan obligation which the mortgage had secured, a point on which the parties were in agreement. There was no dispute that release of the liens did not excuse the estate from its responsibilities to repay the promissory note.

There was no need for the estate to seek release of the mortgage as to Tract I because, as we have just indicated, that parcel was purchased by the FmHA itself. Subsequent to that purchase, and its approval by the court, the FmHA asked the estate to put Tract I up for auction again. The estate agreed to do so provided that the sale

---

[6]We have used the numerical designations assigned to the parcels by the estate in the probate proceeding. Different numerical designations were used by the auction company in advertising the sale.

expenses would be deducted from the proceeds. The FmHA gave written assent to that arrangement. A new sale was conducted, and Tract I was sold to Thelma Keehner for $24,000.

By the time the farmland was sold in 1989, the estate had been open for more than six years. As our discussion has suggested, the relationship between Printy and the FmHA throughout this period was marked by cooperation. Both sides recognized the challenges posed by the insolvency of the estate, and both sides strove to ensure that the estate's financial problems were handled in a rational and appropriate manner.

Although Printy was eventually able to recover a fee for her work as executor and although her son Michael received a share of the proceeds from crop sales over the course of the years, the arrangement enured principally to the benefit of the United States. As a result of Printy's efforts and the substantial assistance she received from Cherry, the estate was able to pay in full three of the four government loans still outstanding at the time of Funk's death and make substantial payments toward the fourth. The government was spared the expense of foreclosure, did not have to seek partition of the property, and was able to share in the revenue produced by the farm without assuming any risk or responsibility for the farm's operations. The land was kept productive and its value was preserved, if not increased, until Michael turned 18 and the property could be sold. In addition, when the property was sold, the government was freed from having to make any of the arrangements. The sales were organized by Printy and the closings were handled by Printy.

Printy drafted a proposed final report and account in the spring of 1989 and submitted a copy of it to the government. Despite the extent of the work Printy had done and the advantages the government received as a result of her labors, the FmHA and the assistant United States Attorney with whom it was then consulting about the case were displeased by the final attorney fees which the proposed final account and report showed that Printy had paid Cherry. Although the government did not object to them at the time they were approved by the court, the FmHA and the assistant United States Attorney also had concerns over the executor fees Printy was paid. In September of 1989, the government therefore requested "a breakdown of the hours and expenses for the administrative and

attorney costs in handling [the] estate." It also asked for information regarding how the surviving spouse award had been determined even though, as with the executor fee, it had not objected to either installment of that award at the time the installments were approved by the court and paid.

Cherry discovered problems with the proposed final report unrelated to the foregoing issues and refrained from filing it with the court. Although that draft was never filed, the government nevertheless filed an objection to it. That objection was limited to the amount of executor fees Printy had received and the size of the payments she had made to Cherry for attorney fees after October 26, 1987. The government did not challenge the estate's authority to make the payments. Its contention was simply that the payments were excessive given the size of the estate.

The government's objection lay dormant in the court file. Hearings were scheduled at various times and rescheduled, without objection. On October 20, 1989, the cause was "continued generally to be reset at request of parties." The reason given for this continuance was that the final tax returns, necessary to determine the amount available for distribution, had not been completed.

Although nothing further was filed with the court during the ensuing months, the United States Attorney's office sent Cherry a letter in late June of 1990 claiming that the balance due on the mortgage as of June 25, 1990, had risen to $294,485.17.[7] The letter

---

[7]The reason this sum was so much higher than the original amount claimed by the FmHA was that the United States Attorney's office believed that interest should continue to accrue on the mortgage until it was paid in full. We note, however, that the status of the estate's obligation to pay such interest was unclear once it acceded to the FmHA's request for it to continue operation of the farm until Michael turned 18. Interest was not addressed in the relevant correspondence. Instead, as we have described elsewhere in this opinion, the arrangement simply called for the estate to pay the FmHA its share of the crop proceeds until Michael attained his majority, then apply net proceeds from the sale of the property to satisfy the mortgage. Given the size of the balance due on the mortgage at the time of Funk's death, the estimated value of the property, and the land's productivity, there was no possibility that the estate would ever be able to cover additional interest, which accrued at the rate of $50.68 per day, for the period the estate was asked to operate the farm prior to its sale. Had Printy realized that the

stated that "legitimate itemized expenses relating to the sale of the property can be deducted from the sale proceeds," but demanded full payment within 30 days.

Cherry filed a prompt response to that letter which provided documentation about the sales and advising that a current report would be forthcoming. Cherry's response elicited another letter from the United States Attorney's office, dated August 17, 1990, advising that based on the information Cherry had provided, the estate should distribute $126,161.57 of the sale proceeds to the FmHA, consisting of $131,477.90 in proceeds less $5,316.33 in sale expenses. Inexplicably, the letter then concluded by stating that the United States Attorney's office would be "making formal demand for full payment of $131,477.90 to FMHA within 30 days."

One week later, on August 24, 1990, the estate filed its fifth report and account with the court. This report covered the period between October 26, 1987, when the fourth report ended, and August 10, 1990. That report showed that the estate began with a cash balance of $4,030.73 at the start of the period and collected an additional $189,431.24, consisting of $14,415.40 in proceeds from the sale of crops harvested from the farm prior to its sale, $167,235.96 from sale of the farm itself, monthly interest on the estate's bank account, and a few minor items, including refund of an overpayment from the Internal Revenue Service. Offsetting the receipts were $108,946.45 in disbursements, including $39,361.88 to Michael for his share of the crop sales and his interest in the real estate, $4,023.50 to the company which conducted the real estate auction, charges for advertising the auction, real estate taxes, federal taxes, tax preparation fees, expenses for fence repair, the $25,000 executor fee approved by the court and paid to Printy, and Cherry's

---

government might eventually seek to collect all that additional interest, she would have had no reason to agree to assist the FmHA. The best interests of the estate would have dictated that the agency be left to seek foreclosure and whatever other legal remedies it might have.

attorney fees. According to the report, the attorney fees consisted of $7,994.50 paid to Cherry as they were incurred in installments ranging from $37.50 to $1,830.00 plus a final lump-sum payment of $25,000 in April of 1989.

Following these disbursements, the cash balance left in the estate to pay creditors was $84,515.52. All but $141.38 of this amount was transferred to an interest-bearing trust account to protect Printy from any temptation she might have to use the funds for nonestate purposes and to ensure that they remained available to meet the estate's obligations. The existence, size and purpose of the trust account were known to the court and documented in the record.

Shortly after the fifth report and account was filed, the government filed a new objection. As with the government's 1989 objection, this version claimed that the executor fees and attorney fees were excessive. In addition, it complained that although the FmHA had agreed to release its liens on the farmland to facilitate the property's sale and the sale had gone forward, it had not yet received any of the proceeds. No other aspect of the report or the administration of the estate was questioned. The objection simply asked for an order (1) requiring Printy and Cherry to document the basis for the $25,000 payments each of them had received in the latest reporting period and (2) directing the estate to immediately disburse the amounts still owed to the FmHA.

In demanding payment of the amounts still owed to the FmHA, the government's objection asserted that the estate had made no payments "to FmHA on the farming property." This claim was false. As we have noted, Printy made several payments to the FmHA which were credited against the balance due on the mortgage. In July of 1985, Printy had issued a check to the FmHA for $110,000, of which $41,210.52 was applied to the mortgage and the balance was used to pay off the other three loans in full. In addition, Printy paid $7,941.02 to the FmHA in 1985 and $2,700 to the FmHA in 1986 as its share of the proceeds from the sale of crops. Both sums were applied to the mortgage, the only debt the estate still owed to the FmHA after the other three loans were paid off.[8]

---

[8]The government's objection, which failed to acknowledge the estate's payments, claimed that the total amount due under the mortgage had risen

Following submission of the government's objection, the cause went dormant again. The next filing occurred on February 10, 1992, when Printy filed her sixth verified report and account. This account covered the period between her previous report and account and January 7, 1992. According to this report, the estate's sole income consisted of $6,991.63 in interest earned on the account in which the proceeds of the land sale were being held. Disbursements, totalling $2,699.56, consisted of bank service charges, state and federal taxes and $200 paid to a tax preparer. Although Cherry continued to perform significant services on behalf of the estate, he received no fees from the estate for those services and submitted no claim to the court for compensation. At the end of the reporting period, the estate reported having a total of $88,807.59 in the bank. All other assets had been distributed. It owned nothing else.

Printy's sixth report and account triggered a brief objection from the government. The objection did not dispute the veracity of Printy's report or the accuracy of her accounts. It merely renewed the government's complaint that it had not yet "been paid the amounts that are owed to it from the sale of the decedent's property." In addition, it asserted, as it had in its initial objection, that the $25,000

---

to $298,228.59 as of September 7, 1990. As it happened, the FmHA generated a letter to the estate just 12 days later indicating that the amount actually delinquent on the promissory note secured by the mortgage was only $104,216.09. In raising only the delinquency, the FmHA assumed the terms of the promissory note and mortgage continued to apply normally notwithstanding Funk's death. In claiming the full amount due, including all accrued interest, the United States Attorney was following the view implicit in the original claim submitted to the probate court by the FmHA that the loan accelerated and became due and payable in full on Funk's death.

paid to Printy and approved by the court for her executor fee and the final $25,000 in attorney fees paid to Cherry for his work on behalf of the estate were "excessive and unreasonable."

Nothing further took place until the following year. In April of 1993, Printy filed her seventh verified report and account. Once again, the sole income received by the estate was interest from the bank account containing the proceeds from the sale of the farm. This time, the interest totaled $4,094.89. Disbursements, amounting to $886.77, were made for bank service charges, a tax preparation fee and state and federal taxes. The result was a net increase in the estate's accounts to $92,015.71. No other assets remained and none were reported. As with the previous report, no additional attorney fees were paid or requested even though Cherry continued to perform work on the estate's behalf.

Following submission of the seventh report, the government elected not to file any new objections. Another year passed. Although nothing further was filed with the court during the interim, the record shows that Cherry was in ongoing communication with the FmHA and the United States Attorney's office in an effort to resolve any remaining issues, settle the FmHA's claims, and finally close the estate. The sticking point had nothing to do with the FmHA's priority over the other creditors whose claims had been allowed but remained unpaid. It was assumed that whatever money remained in the estate's accounts would be paid to the FmHA in satisfaction of the promissory note secured by the mortgage. The difficulty was with Printy's $25,000 executor's fee and the final $25,000.00 in attorney fees paid to Cherry in April of 1989, four years earlier. The FmHA did not question that Printy was entitled to an executor's fee or that Cherry should be paid for the legal work he performed on behalf of the estate. As we have already noted, giving priority to such expenses of administration was permitted by the Federal Insolvency Statute (31 U.S.C. §3713) and specifically acknowledged by the FmHA when it asserted its original claim in the probate action. The only problem the FmHA had with the fees, so far as we can tell, was the one it asserted in the objections it filed to Printy's fifth and sixth verified reports and accounts and to the proposed final account circulated but never filed in 1989: it believed that the disputed $50,000 in fees were simply excessive and unreasonable.

The government's view was that if the executor and attorney fees were scaled back, the money could be added to the funds obtained from the sale of the farm, thereby increasing the amount the government would receive in satisfaction of the promissory note secured by the mortgage. Without that adjustment, the amount the government stood to recover from the estate was the $92,015.71 identified in Printy's seventh report and account, plus any interest accruing since the report was filed. In a letter transmitted to Cherry in August of 1993, the government advised that it believed $124,500 to be a fair settlement amount, taking into account the costs of the sale, including publication costs and Cherry's attorney fees.

The government's settlement offer exceeded the funds left in the estate by $32,484.29. It would therefore have necessitated return by Printy of some, if not all, of the executor's fees approved by the court, leaving her with no compensation for a decade's worth of work on behalf of the estate and for the benefit of the government. It would also have required Cherry to further discount his fee, notwithstanding that he been paid nothing for his work since 1989, and made no provision for further payment, despite the fact that the estate could still not be closed and significant work for the estate still lay ahead.

Although records filed with the circuit court showed that Cherry prepared a proposed stipulation and judgment in April of 1994, the terms of that stipulation have not been disclosed. All we know is that no settlement was reached. Failing settlement, Cherry returned to court to obtain a hearing on the government's objections to Printy's $25,000 executor's fee and the $25,000 final payment he received for his attorney fees and for resolution of the government's claim for repayment of the promissory note secured by the mortgage on Funk's farm. The circuit court granted Cherry's request and set the matter for hearing on June 17, 1994.

Cherry's efforts to enlist the aid of the court had an unexpected effect. Rather than hasten the long overdue termination of Funk's estate, it triggered a succession of legal maneuvers by the United States Attorney's office that would ultimately keep the estate open for another full decade and more. The government's immediate response was to file an objection to the estate's "current report and account." That objection, filed less than a week before the scheduled June 17 hearing, was not addressed to the seventh and most recent current

report and account filed in April of 1993. It was not even addressed to report and account filed before that, in February of 1992. Instead, it reached back to the fifth account and report filed nearly four years earlier on August 24, 1990.

As we have detailed, the government already had an objection to that report and account on file. Submitted on September 10, 1990, that objection claimed simply that the $25,000 executor fee received by Printy and the $25,000 final attorney fee payment made to Cherry were excessive and unreasonable. As relief, the objection requested an order requiring Printy and Cherry to document the basis for the foregoing payments and directing the estate to immediately disburse the amounts still owed to the FmHA.

The new objection submitted by the government purported to be a memorandum in support of the September 10, 1990, objection. In one limited respect it was. It did address the assertion made in the September 10, 1990, objection that the $25,000 payments to Printy and Cherry reported in the August 24, 1990, report and account could not be justified absent additional documentation. Aside from that, however, the 1994 memorandum represented a quantum shift in the government's position. In direct contrast to the position it had taken since the inception of these proceedings, the government asserted that none of the expenses of administration, including attorney fees, could be paid out of the proceeds of the sale of the farmland secured by the FmHA mortgage. It further asserted, for the first time, that the estate had failed to properly distribute to the government the estate's share of the proceeds from the sale of crops for the years 1987 and 1988, and suggested that the conduct of Printy and Cherry in handling the estate's affairs in the years that followed had been wrongful.

With respect to its claim that Printy and Cherry had acted improperly in administering the estate, the government anticipated, quite rightly, that Printy and Cherry would adduce evidence that their actions were sanctioned by the FmHA officials with whom they had dealt regarding the government's claims. To forestall this defense, the United States Attorney's office filed a motion *in limine* prior to the scheduled hearing to bar the introduction into evidence of any representations by the FmHA officials "concerning use of proceeds of sale of real estate mortgaged to [FmHA] for payment of any costs of administration, attorney's fees incurred in probating this estate,

executor's fees or any other fees or expenses except for costs of sale of the mortgaged real estate."

The June 17 hearing was postponed to provide Cherry time to file a response to the government's latest objection. On July 15, the hearing was continued again at the request of the United States Attorney's office. Ironically, the reason given by the government for seeking the request was that one of the principle FmHA officials with whom Printy and Cherry had dealt was unavailable to testify at that time.

In due course, Cherry, on behalf of the estate, filed an objection to the government's motion *in limine* and a response to the new objection to the August 24, 1990, report and account. Following various developments, including a decision by the government in September of 1994 to submit a belated objection to Printy's fourth verified report and account dated November 12, 1987, the court conducted a hearing on the motion *in limine* in December of 1994. The motion was denied. The court then continued the hearing on the government's objections and set a discovery schedule.

With the failure of its motion *in limine* and the circuit court's decision to permit additional discovery before reaching the merits of the government's latest objections, the United States Attorney's office decided to seek relief in a different forum under another new theory. It brought a civil action against Cherry and Printy in the United States District Court for the Central District of Illinois alleging that the two of them had converted the proceeds from the sale of the mortgaged farmland. The federal court, however, refused to allow the United States to use that forum to supplant the ongoing state court proceedings. It abstained from hearing the government's claim under the authority of *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 817-18, 47 L. Ed. 2d 483, 498, 96 S. Ct. 1236, 1246 (1976), which permits a federal court to stay or dismiss a suit, in exceptional circumstances, when a concurrent state proceeding is pending and the stay or dismissal of the federal action would promote wise judicial administration.

*Colorado River* abstention is discretionary. In determining whether the doctrine should be invoked, a court must consider a number of factors. One of those factors is the vexatious or contrived nature of the federal claim. See *Clark v. Lacey*, 376 F.3d 682, 685

(7th Cir. 2004). In applying that factor to the government's federal action here, the federal district judge cited contentions raised by Printy and Cherry that the United States had looked to the federal forum because of the failure of its motion *in limine* in the state court action and that it had joined Cherry as a party only because it believed Printy to be indigent and unlikely to have the resources to satisfy a judgment, while Cherry was perceived to be wealthy.

The federal judge specifically stated that he agreed with this characterization of what had taken place. He wrote that the United States had litigated the same issue asserted in the federal action

> "in the probate proceeding beginning in 1989 when it first [Printy and Cherry]. After such time, it allowed [Printy and Cherry] to continue the sale of the last piece of property. In 1994, as the issue regarding the use of the proceeds of the mortgage to pay the attorney and executor fees came close to the hearing, [the United States] filed a motion *in limine* to prevent FmHA agent Jeffrey Koch from testifying. On March 31, 1995, [the United States] filed the action in federal court. The Court has no doubt that such action was in response to the adverse ruling from the state court regarding its motion *in limine*. It appears that [the United States] thought it would lose its claim and sought another forum." *United States of America v. Cherry*, No. 95–3101, slip op. at 14 (C.D. Ill. October 28, 1996).

Based on this and other factors, the court stayed the federal action pending termination of the probate proceeding in state court and denied a pending motion for summary judgment filed by the United States. *United States of America v. Cherry*, slip op. at 14-15.

While the federal action was pending, Printy filed exhaustive documentation with the circuit court in response to interrogatories previously propounded by the government. The probate action was subsequently stayed pending the federal court's determination as to whether it would proceed with the government's federal claim. The decision by the federal court to abstain from hearing the government's federal claim was filed at the end of October 1996. Following that ruling, the probate proceedings went forward again.

In June of 1997, a hearing was held in the circuit court at which the parties agreed to complete discovery by September 9, 1997, a

pretrial hearing was scheduled for October 16, 1997, and a hearing on the government's objections to Printy's fifth verified report and account was set for November 1997. Immediately after the June 1997 hearing, the government served Printy with a voluminous request for admission of facts. When Printy balked at responding to the request to admit, the government moved for an order deeming the facts set forth in the request to have been admitted unless Printy could show cause why those facts "should not be confessed against her." Following a written objection by the estate and a hearing on October 16, 1997, at which both parties were represented, the government's motion was denied.

Approximately two weeks later, on October 29, 1997, the government filed an objection to the estate's seventh report and account, which had been filed by Printy in April of 1993. That objection took issue with $844.95 in disbursements made by Printy on the estate's behalf to pay federal and state taxes and to cover the fee charged by the tax preparer. The basis for the objection was that the payments had been made from "collateral pledged to the United States" and were unauthorized. The government asserted this claim notwithstanding the fact that the estate no longer held any collateral pledged to the United States in 1993. The last collateral held by the estate was the farm, which had been auctioned off in the late 1980's with the agreement of the government and the approval of the court. The government had released its security interest in the farmland so that the sales could close, and the net proceeds were deposited in the estate's account.

Language at the conclusion of the objection indicates that what the government actually meant to say was that disbursement of the *proceeds* from the sale to pay the challenged expenses should not have been made by the estate without the government's permission, notwithstanding the fact that the government had voluntarily released its liens on the land prior to the completion of the sale and receipt of the purchase price from the buyers. The government did not elaborate, however, and offered no legal authority for such a view. In addition, it proffered no explanation for why it was raising its objection for the first time approximately 4½ after the expenses were paid and the report and account detailing their payment was filed with the court.

No action was taken on the foregoing objections. The sole matter before the court was the government's objections to the fifth verified report and account filed by the executor on August 24, 1990. The specific date set for that hearing was November 18, 1997. Less than a week before that hearing, the government filed approximately 60 pages of notices, motions and memoranda. Included were a notice that it intended to call Cherry, attorney for the estate, as an adverse witness for the government; a renewed motion *in limine* with supporting memorandum to bar FmHA officials from testifying regarding approval they had given the estate to pay various expenses; a petition to order Printy to pay the government $102,875.02 in interest based on the fact that she had still not disbursed to the United States its share of the proceeds from the sale of the farm; and a memorandum asking the court to consider all of the objections it had

ever filed in the case, not just the objections to the August 24, 1990, report that were presently set for a hearing.[9]

---

[9]The government's pleadings also suggested that Cherry's dealings with FmHA officials violated his ethical responsibilities. The ethics charge is premised on the government's belief that beginning in 1984, Cherry should not have had any direct contact with the FmHA in representing the estate. In its view, he was obligated to deal solely with representatives of the United States Attorney's office. The record before us, however, contains nothing to suggest that Cherry's communications with the government were improper or were thought to be improper by the United States Attorney's office during the 14 years leading to the November 1997 hearing. Cherry was meticulous in providing the United States Attorney's office with notice of everything he did in the case and attempted to maintain ongoing and open communication with that office. To the extent he communicated with the FmHA rather than someone from the United States Attorney's office, such communication occurred with either express or implicit prior authorization of the government's lawyers. At all times, he dealt with the representatives

he believed the government wished him to deal with. Sometimes that was a deputy United States Attorney. Sometimes it was an official from the FmHA. On at least one occasion, a deputy United States Attorney actually expressed confusion as to why Cherry had contacted his office about something rather than simply going to the FmHA. Given the history of the case and the relationship between the various parties and entities, no legitimate claim can be made that Cherry ever attempted to circumvent the United States Attorney's office or engage in communications which the United States Attorney's office opposed.

When the government filed the foregoing motions, interest earned on the estate's trust account over the years had increased the account's balance to $104,382.20. That sum represented all that was left in the estate, and there was no dispute–there had never been any dispute–that the FmHA had priority over all other creditors whose claims for repayment of debts of the decedent which remained unsatisfied. Accordingly, Cherry sought and obtained an order authorizing him to release the funds to Printy, as executor of the estate, for payment to the FmHA. The circuit court granted that order. Neither Printy nor Cherry sought any further payment for their work on the estate's behalf, and no deductions were made for costs of administration. The entire sum was paid to the FmHA. Accordingly, as of November 1997, the estate was exhausted.

Once the FmHA received from the estate all it had left to give, one might have anticipated that the estate could, at last, have been closed. That was not to be. Although 14 years had passed since the estate was first opened, it would be another six years before the circuit court was able to enter its final order in the case.

On November 18, 1997, the court proceeded with its hearing on the August 24, 1990, report and account and the government's objections to that report. The deputy United States Attorney's motion *in limine* was denied. In response to the government's notice that Cherry would be called as an adverse witness, he moved to withdraw as Printy's attorney. After discussion between counsel and the court, consideration of the position Printy would be left in if she were left without counsel, and the receipt of testimony from Printy that she understood the conflict and still wanted Cherry to serve as her lawyer, the motion to withdraw was itself withdrawn, and the hearing went forward.

Printy was the only witness called to testify. Despite the breadth of the issues raised in the prehearing motions and memoranda filed by the government, the focus of the hearing was limited. It centered on the specifics of how the proceeds of the farmland sales were handled. At the conclusion of the hearing, the court indicated that it would not revisit reports and accounts that had previously been approved, but that it would not approve the August 24, 1990, report and account because of uncertainties it had regarding how and when proceeds from the sale of the farm were distributed, and why the

FmHA had not received its share earlier. The estate was given until March 2, 1998, to file a new report "showing the receipt of funds from the sale of all property secured by [FmHA] and the disbursement of all those funds or their present location," and the government was given six days beyond that to file any objection.

Cherry, still acting on behalf of the estate, promptly complied with the court's order. On March 2, 1998, he filed a new report itemizing and describing everything that had been done in the administration of the estate from the date of Funk's death in 1983 to the date on which the new report was filed. The report was supported by extensive documentation, including copies of every notice, claim, bill, and cancelled check generated during the course of the estate's administration; copies of all correspondence from and to the FmHA and the United States Attorney's office; contemporaneous notes kept by Cherry of his discussions with Printy and the government representatives regarding estate matters; and Cherry's itemized billing records showing what work he did, when he did it, how long it took, and how much he charged.

The United States Attorney's office responded to this new report by moving to strike it, to obtain an expedited hearing on its motion to strike and an extension of the deadline to file an objection to the new report and to reopen discovery. The motion to strike was denied by order entered April 20, 1998. At the same time, the court gave the government additional time, to June 12, 1998, to file its objection and reserved the issue of whether discovery should be reopened.

Immediately before the scheduled hearing, the United States filed an objection to the amended report and to the documentation submitted by the estate in support of that report. Once again it filed a motion *in limine* to bar FmHA officials from testifying about authorizations they had given to the estate with respect to the use of proceeds from the sale of property in which the FmHA held a security interest or interest accrued on those proceeds. In addition, it filed an updated version of its prior petition asking that Printy be ordered to pay the government $102,875.02 in interest based on her allegedly "wrongful" failure to timely disburse to the United States its share of the proceeds from the sale of the farm. Unlike the prior petition, the updated version was not limited to interest attributable to delay in transmitting the proceeds from the farm auction. It also

asked for interest based on alleged delays in paying the FmHA its share of proceeds from the sale of machinery and grain in which the government had held security interests. The government made this claim notwithstanding the fact, noted earlier, that the loans for which the grain and machinery were pledged as collateral had been repaid and the corresponding promissory notes returned marked "paid in full" 13 years earlier in 1985.

On June 18, 1998, the impending hearing was rescheduled for July 20, 1998. Prior to the new hearing date, the government filed yet another motion *in limine* to bar testimony from the FmHA officials with whom Printy and Cherry had dealt. It also submitted a 47-page supplemental response to Printy's amended report. At the hearing, the court questioned counsel for the United States regarding the truth and accuracy of the records submitted by the estate in support of its amended report. Counsel conceded that the government had no reason to believe that any of the financial records were incorrect. There was no dispute that the court had before it every pertinent document Cherry and the estate possessed. The question which had motivated the government's initial concern in the case, namely, whether the basis for $25,000 executor fee and the final $25,000 attorney fee payment could be substantiated, dissolved. The government no longer contended that Cherry's fees were unreasonable and excessive. The detailed records he provided foreclosed any such claim. So too fell the argument raised by the government in its objection to the August 24, 1990, report that the estate had failed to pay the FmHA any of the proceeds from the sale of the farm. As we have noted, the estate paid the FmHA all of the net proceeds from the farm sale, plus accrued interest, a year earlier. Ultimately, the matter left for the court to resolve was whether, under the law, the estate was administered properly and the government had been paid everything it was due. Finding that it had sufficient evidence to make that determination, the court denied the government's motion *in limine*, rejected a challenge by the government to the admissibility of the estate's report and objections, and took the case under advisement without hearing additional testimony.

Believing that it should have been given a more complete opportunity to present its case, the government filed what it denominated as a "motion to reconsider denial of evidentiary hearing

and offer of proof on executor's amended current report, objection and response to same and motions in limine." No response was filed on behalf of the estate. Shortly thereafter, the court entered a detailed order regarding the administration of the estate and the validity of the government's objections. That order, dated July 23, 1998, found: (1) that the government had agreed with the estate to delay the sale of the farm until Michael reached his majority, (2) that the government's sole objection following the sale was to the amount of the fees paid to the executor and attorney, (3) that the government had withdrawn its objection to the amount of the fees and now objected to the executor's report on the grounds that under controlling law, the executor should have paid the United States a greater share of the proceeds of the sale, (4) that no objection was made to the truth or accuracy of the content of the current report, (5) that the current report contained a full and accurate accounting of the receipts and disbursements of estate property, (6) that at the outset of these proceedings, the FmHA claimed that a total of $234,106.86 plus interest remained due on the four loans it had issued to Funk prior to his death, (7) that the FmHA eventually received a total of $225,023.33 from the estate, (8) that the executor and her attorney "experienced considerable risk and responsibility in handling an insolvent estate which contained farmland owned in part by a minor and secured by a federal agency," and (9) that the court's examination of the evidence revealed no expenditures that were not reasonable and necessary for the preservation of the estate property "which was the real estate upon which the U.S. had a security interest." Based upon the foregoing, the court concluded that the actions of Printy and Cherry were "reasonable and necessary under the circumstances of a complex and insolvent estate." Accordingly, it approved the amended report submitted by Printy on March 2, 1998.

The government appealed. The appellate court reversed and remanded, holding that the circuit court's ruling was tantamount to entry of judgment on the pleadings and that genuine issues of material fact remained which should have precluded such a disposition. In the appellate court's view, an evidentiary hearing should have been conducted. *In re Estate of Funk,* No. 4‒98‒0640 (1999) (unpublished order under Supreme Court Rule 23).

Following remand, the circuit judge who had presided over the case recused himself. The case was reassigned. The United States

then submitted a lengthy bench memo summarizing its view of the case and restating its arguments as to why the amended report submitted by Printy on March 2, 1998, should not be approved. In addition, and for the first time, the government asked the circuit court to enter a "surcharge monetary judgement against [Printy] individually and in her capacity as executor in the amount of $90,092.66 plus interest" to recoup the additional sums it believed the estate should have paid to the FmHA over the years. Although no hearing was then scheduled, the government also filed a renewed motion *in limine* to bar testimony from the FmHA officials with whom Printy and Cherry had dealt in handling the estate.

The judge to whom the case had been reassigned also recused himself. The case was then assigned to a new judge who conducted a thorough evidentiary hearing. At that hearing, conducted November 2, 1999, testimony was received from Printy, officials of the FmHA, and two deputy United States Attorneys who had been involved with the case earlier in its history. Numerous documents were admitted into evidence. Argument was heard, counsel were given the opportunity to file posttrial memoranda, and the case was taken under advisement.

On February 10, 2000, the court issued a lengthy written order setting forth the history of the case and the arguments of the parties. Following its detailed review, the court concluded:

> "Having considered the evidence presented at [the hearing], the Court record, the voluminous material submitted by the United States and the arguments of the parties, the Court is of the opinion and finds that the position of the executor is the more reasonable and legally supportable position. From the beginning of the administration of this estate it was clear to all parties that the estate was insolvent. As early as October of 1984, all parties recognized that upon his death in January of 1983, Floyd Funk owed more than he owned in property. Knowing this information, the United States, through its agent the Farmers Home Administration allowed the executor and her attorney to operate the estate. While this was not a settlement of the claim, it was acquiescence in a course of action that has certain consequences. The executor and the attorney who

operated the farm and administered the estate during this time period are entitled to compensation for their activities. The wisdom of this decision [to have the estate continued to operate the farm] is not at issue. In point of fact by this decision by the FmHA mitigated [its] damages in this case. [It has] received substantial sums of money that [it] might not have otherwise received had [it] commenced legal action earlier in this proceeding.

The United States by their various agents in this protracted litigation established a procedure for the land in question to continue to operate as a viable farm and income producing property. Having allowed the operation to continue, the government now says all of its secured claims should take first priority. Under the Probate Act, reasonable expenses of the executor and attorneys fees take priority over the claims of the United States government. Those are the only fees being paid in the present case. They are reasonable and appropriate under the circumstances.

The executor and her attorney acted reasonably under the particular facts of this case. Their expenses were reasonable and there is no evidence to suggest that those expenses were the result of mismanagement, fraud or other misconduct. The amended current report is approved by the Court. The estate shall be closed and the executor discharged."

The government appealed again. This time it argued that the circuit court's opinion was erroneous as a matter of law. The basis for that argument was that the security interests it held in Funk's property trumped any entitlement the executor and her attorney may otherwise have had under the Probate Act to recovery of the expenses of administration. A divided appellate court agreed. It therefore reversed and remanded for yet more proceedings. *In re Estate of Funk*, No. 4–00–0178 (2000) (unpublished order under Supreme Court Rule 23). In so doing, the appellate court made no mention of the Federal Insolvency Statute (31 U.S.C. §3713) invoked by the government at the outset of these proceedings as the basis for the priority it claimed.

Shortly before the appellate court rendered the foregoing decision, Cherry was elected State's Attorney of Scott County. That position precluded him from continuing to engage in the private

practice of law. 55 ILCS 5/4–2001(b) (West 2004). He was therefore compelled to seek leave of court to withdraw as Printy's attorney. In response, the United States stated that while it had no objection to Cherry's withdrawal, it believed that the circuit court should order Cherry to "return to the United States its secured moneys paid to him without prior court approval."

A hearing on Cherry's motion to withdraw was conducted in March of 2001. At the conclusion of the hearing, *the circuit court* allowed Cherry to withdraw but ordered that he remain in the case as an interested party; continued the case for 21 days to allow Printy an opportunity to obtain new counsel; and ordered the United States to file, within 30 days following the above-mentioned 21-day period, a final account of Printy's actions as executor.

We do not know why the circuit court authorized the government to file a final account. Pragmatic considerations are one possibility. Printy testified at the hearing that she had no money to retain replacement counsel, and the court may have believed that unless the government was given responsibility for preparing a final accounting, no accounting would be filed. We note, however, that the Probate Act of 1975 does not authorize this procedure. Under the Act, responsibility for submitting accounts of the administration of the estate rests with the representative of the estate authorized by the court to carry out that administration. 755 ILCS 5/24–1 (West 2004). The United States was not the estate's representative. Printy was.

The Probate Act does contain procedures for ensuring that required accounts are prepared and submitted if the duly authorized representative dies or falls under a legal disability (755 ILCS 5/24–13 (West 2004)) or the letters issued to a representative are revoked and the representative fails or refuses to file an account within the time fixed by the court (755 ILCS 5/24–14 (West 2004)). None of those circumstances were present here. Printy was not dead or disabled, the letters issued to her were not revoked and she had not failed or refused to file accounts within the time set by the court.

We note, moreover, that even if Printy had died, resigned or had her letters of administration revoked, it is by no means clear that the United States would have been an appropriate successor. The Probate Act sets forth a preference list from which successor representatives may be selected. See 755 ILCS 5/9–2, 9–3 (West 2004). Creditors of

the estate, which is all the United States is here, are at the very bottom of the list. 755 ILCS 5/9‒3(b), (j) (West 2004). Funk had numerous surviving relatives who would have been eligible for consideration first.[10]

No longer represented by counsel, Printy filed no objection to the circuit court's decision to transfer responsibility for the accounting to the government. In accordance with the judge's order, the United States prepared its proposed final account and filed it on April 11, 2001. Although the probate act requires accounts to be verified (755 ILCS 5/24‒1 (West 2004)), this one was not. It was not even signed by someone with direct knowledge of how the estate's assets had been managed. The signatory was an assistant United States Attorney who had not entered the case until after the estate had been open for more than a decade and all the real and personal property had long-since been sold.

Although the record shows that a copy of the account was mailed to Printy, she still lacked counsel, as she would throughout the remainder of these proceedings, and did not take issue with either the

---

[10]There is also the question of whether the United States would be legally eligible to serve as a representative of the estate. The Probate Act requires that the administrator be a "person." 755 ILCS 5/9‒1 (West 2004). It is true that under Illinois law, a body politic may sometimes qualify as a person. See 5 ILCS 70/1.05 (West 2004). With respect to who may serve as an administrator, however, the Probate Act appears to contemplate that he or she must be a natural person. See 755 ILCS 5/9‒3 (West 2004). An exception exists for corporations qualified to accept and execute trusts in our state (755 ILCS 5/1‒3 (West 2004)), but the law confers no similar authorization on the United States.

technical sufficiency or the substance of the document. Thus freed from meaningful adversarial challenge, the government's account implemented its view that the court should undertake a comprehensive reexamination of the receipts and expenditures handled by the estate since its inception two decades earlier, even those that had previously been approved by the court without objection by the United States, and that it should do so without any reference to the estate's lengthy cooperation with the FmHA. In the account, the estate's dealings with the FmHA are ignored.

When the cause was before the circuit court in 1999, the government had argued that the amended report submitted by Printy on March 2, 1998, should not be approved and a money judgment should be entered against Printy individually because the government failed to receive $90,092.66 in proceeds and accrued interest to which it was entitled from the sale of the farm, crops, and machinery. In the final account it prepared, the government argued that during the course of administering the estate, Printy had wrongfully distributed to third parties the sum of $89,666.49.

The largest single component of this sum was attorney fees paid to Cherry. Cherry was paid a total of $45,814.48 for his work on the estate's behalf. Those payments were fully documented, and we have mentioned them all in this opinion. They were paid as follows: $4,239 in 1983, $2,269.75 in 1984, $2,695 in 1985-86, $3,616.23 in 1986-87, and $32,994.50 in 1987-89. The last amount included the $25,000 lump sum payment Cherry received after the government released its security interest in the farmland, the farm sales were closed, and the proceeds were paid to the estate. The government received notice of all these payments. The payments for 1983 and 1984, totaling $6,508.75, were specifically approved by the circuit court. With the exception of the final $25,000 for which it sought supporting documentation, the government filed no objection to the accounts in which the fees were reported until many years later.

In its proposed final report, the government stated that $38,830.73 of Cherry's fees should not have been paid. It does not explain how it arrived at this particular amount. That Cherry did the work and that the fees were reasonable is not disputed. As it had begun doing in 1994, five years after the last of the fees had been

paid, the government contended simply that the money used to pay the fees should have gone to it and not Cherry.

After the $38,830.73 in attorney fees, the next largest sum challenged in the government's report is the $25,000 executor's fee approved by the court and paid to Printy in 1989. Inexplicably, the government next took issue with $11,111.25 of the $30,000 surviving spouse award which had been approved by the court and paid to Printy in two installments, the first in 1983 and the second in 1984, both prior to the sale of the farm. The government also challenged $4,000 of the $6,000 surviving child award, which, like the surviving spouse award, had been approved by the court and paid in two installments in 1983 and 1984. Although the government once inquired as to the basis for the surviving spouse award, this document marked the first time the surviving child award had been directly contested.

The remaining sums challenged in the government's account consisted of state and federal income tax paid by the estate on money earned from the sale of property in which the government held security interests, tax preparation fees, miscellaneous bank fees pertaining to the account in which the estate held its funds, final court costs incurred in connection with the real estate sale, and $920.16 which the government contends should have been deducted from Michael's share of the proceeds from the sale of the farm to cover his share of the sale expenses.

With respect to all of the foregoing payments, the government's position was not that they were unreasonable or excessive. As in the case of the attorney fees, its argument was that it had a superior claim to the money used to pay them. Although it filed no contemporaneous objections to any of the payments, it believed that the executor's decision to pay the expenses rather than apply the funds to the loan balance due the United States was wrongful.

Printy filed no objection to the final account proposed by the government. After hearing nothing from her, the court, *sua sponte*, issued a rule to show cause why she should not be removed as representative of the estate. The court was reluctant to act on the government's proposed final account without insuring that the parties' various interest were properly represented and believed that given the conflict of interest that existed between Printy, Cherry and the

government, a different executor was needed, someone who could, at last, wind the matter down.

The court convened a hearing on the matter in August of 2001. Printy appeared and made her position clear. She testified:

> "This has gone on 19 years this February. And I have got to a point with the diabetes that I can't remember. I am having seizures now and it's just gotten so bad that I don't want to be executor because I asked 3 or 4 times before why can't I withdraw from this? Because Mr. Cherry has done all the work. I haven't done anything except go back and forth to court and ask the same questions over and over. And I don't want no more of it. I can't handle it."

Following discussion on the record with counsel, and the realization that it would be difficult to get anyone to replace Printy, particularly since there was no money left in the estate, the court elected to maintain the status quo and refrained from removing Printy as executor. The court further indicated that it would adopt the final account submitted by the United States. When the government submitted the appropriate order to the court, the court signed it without any further evidentiary hearing.

The order which the government prepared and the trial court signed found that Printy had wrongfully distributed "$89,666.49 of the United States' secured collateral and accrued interest thereon" as set forth in the government's final account. Because of the source of the funds used to make the challenged payments, the trial court disallowed them. The court's order further provided that Printy was not yet discharged as executor and that further hearings would be scheduled on the following pending matters: (a) the government's petition for entry of a monetary judgment against Printy, (b) its request for relief requiring "attorney Cherry to return to the United States $38,830.73 of its secured collateral," and (c) the petitions it had previously filed seeking the assessment of penalty interest against Printy.

Notwithstanding the language in the order regarding Printy's continued status as executor and the court's intention to schedule additional hearings, the court directed the circuit clerk to enter the following order: "Final [r]eport of the Executor entered this date. Estate closed. Cause stricken." In accordance with the judge's

command, the clerk made a docket entry showing that order. When the government complained that the order conflicted with the order it had prepared for the judge's signature, the trial court advised that the government was free to take an appeal, which it did. On that appeal, the government argued that the docket entry closing the estate and striking the cause should be vacated because it was "fatally inconsistent" with the trial court's September 2001 written order approving the final account. The United States further argued that instead of remanding the cause for further proceedings, the appellate court should order Cherry to return to the United States $38,830.73 in disallowed attorney fees, and enter judgment against Printy for $89,666.49, to be offset by a credit totaling whatever amount Cherry might actually repay the government.

Cherry conceded that the docket entry should be vacated. The appellate court accepted Cherry's concession and vacated the docket entry. It declined the government's request for entry of judgment against Printy and Cherry, holding that the trial court had not ruled upon the issues and the parties had not had an opportunity to present all of their evidence on those issues. In accordance with that view, it remanded for further proceedings. *In re Estate of Funk*, No. 4–01–0902 (2002) (unpublished order under Supreme Court Rule 23).

Following remand, the government filed a motion for summary judgment requesting that the circuit court order Cherry to pay to the government the $38,830.73 in attorney fees the court had previously disallowed. Simultaneously, the government requested entry of summary judgment in its favor and against Printy in the amount of $89,666.49, a sum which included the same $38,830.73 sought from Cherry. Both Cherry and Printy responded. Cherry argued, *inter alia*, that the government's motion was premature because a genuine issue of material fact existed as to whether the attorney fees were "unreasonable, excessive[,] or unearned." What Printy had to say was this:

> "I have no idea what all of this is about. I've been tormented and harassed and pushed aside since 1983. You people have taken 20 years of my life and throwed [*sic*] it out the window. Because I sit here in fear wondering what's coming up next. *** I have nothing left. I have to borrow

money to the end of the month sometimes to get by. I think you should go after the right people. I'm just an inocent [*sic*] bystander."

Printy's note was one page long. The government responded with a four-page reply reasserting its entitlement to summary judgment. It also filed a reply to Cherry's response.

A hearing on the government's motions for summary judgment was held February 21, 2003. Following argument by counsel, the court entered judgment in favor of the government and against Printy in the amount of $90,092.66, a sum actually higher than the amount requested by the government in its motion. At the same time, it denied the government's request for summary judgment against Cherry. Noting again that the government no longer challenged the reasonableness of the fees, the court held that the appropriate course was for the government to seek recovery from Printy and for Printy to then seek recovery of the fees from Cherry. In the court's view, allowing the government to proceed directly against Cherry would be inappropriate under the law.

The government filed yet a fourth appeal. Because the estate was still open and issues remained pending, *e.g.*, the government's claim for penalty interest, the appellate court, on its own motion, dismissed the appeal for lack of a final appealable order. The government subsequently moved for dismissal of its request for penalty interest and entry of final judgment. Following one final hearing, that motion was granted. On December 5, 2003, the court entered an order finding Printy liable individually and in her capacity as executor for $90,092.66, plus postjudgment interest, reaffirming its denial of the government's request for an order requiring Cherry to surrender $38,830.73 of the attorney fees he had been paid for his work on the estate, dismissing the government's claims for penalty interest with prejudice, and discharging Printy as executor of the estate.

Once final judgment was entered, the government promptly appealed again. The sole basis for its appeal was that the circuit court erred in refusing to order Cherry to return to the government the $38,830.73 in fees. The appellate court rejected that contention in a published opinion. 355 Ill. App. 3d 466. The appellate court's opinion, as modified on denial of rehearing, held that Cherry's failure to object to the government's accounting precluded him from

challenging the determination that the fees should not have been allowed. In its view, however, the disallowance of the fees did not mean that Cherry was not entitled to be paid for his work. It meant simply that Printy should not have paid the fees using funds which, in the appellate court's view, should have gone to the United States. The appellate court further concluded that Cherry's status in the case was that of a creditor, not a party. In its view, the courts never acquired personal jurisdiction over him and therefore lacked the authority to compel him to pay the money to the government. One member of the appellate court dissented, asserting that the trial court "erred by denying the United States' request that the court order Cherry to return the disallowed attorney fees to [Printy] as executrix."[11]

Shortly after the appellate court filed its opinion, as modified on denial of rehearing, Printy filed a petition for relief under the United States Bankruptcy Code. Pursuant to the Code, the petition automatically stayed continuation of the proceedings against Printy in this case. 11 U.S.C. §362 (2000). On the government's motion, the stay was subsequently lifted, and the appellate court's mandate issued. The United States then petitioned our court for leave to appeal. 177 Ill. 2d R. 315. We granted that petition, and the matter is now before us for a decision. Printy is unrepresented in these proceedings, as she was in the appellate court, and has filed no brief. Cherry appears *pro se*.

As grounds for its appeal, the United States contends that its motion for summary judgment against Cherry was improperly denied. In its view, Cherry should have been required, as matter of law, to

---

[11]In reaching this conclusion, the dissenting judge apparently failed to realize that the government had made no such request. Its motion for summary judgment did not ask that the money be returned to Printy. What the government sought was an order compelling Cherry to "repay to the United States its secured moneys totalling $38,830.73 wrongfully received by him in disallowed attorney's fees."

surrender to the United States $38,830.73 of the attorney fees he had been paid for his work on behalf of the estate, and the appellate court erred in concluding that the court lacked authority to order him to do so.

Ordinarily, the denial of summary judgment is not appealable. That is because orders denying summary judgment are interlocutory in nature. An exception to this rule has been recognized where cross-motions for summary judgment have been filed on the same claim and one party's motion is granted while the opposing motion is denied, thereby disposing of all issues in the case. *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 357 (1999). That situation is not present here. In the matter before us, there were no cross-motions for summary judgment. When it denied the government's motion for summary judgment against Cherry, the circuit court proceeded to finally resolve the case based on all the evidence which had been presented. Any error thereupon merged into the final judgment rendered by the court. *Belleville Toyota, Inc. v. Toyota Motor Sales, U.S.A., Inc.*, 199 Ill. 2d 325, 355 (2002). It is that judgment, not the denial of the government's summary judgment motion, that we must consider.

As we have just discussed, the government's challenge to the appellate court's judgment centers on that court's conclusion that the circuit court never acquired personal jurisdiction over Cherry and therefore lacked authority to order him to surrender the disputed portion of his attorney fees to the United States. The question of the circuit court's jurisdiction was not asserted by Cherry himself and he does not dispute that the circuit court could have exercised jurisdiction over him. His position is that notwithstanding the existence of jurisdiction, the lower courts acted properly in rejecting the government's claim that it was entitled to judgment against him. We agree.

Whether the appellate court misapplied principles of personal jurisdiction is not dispositive of this appeal. The reasons given for a judgment or order are not material if the judgment or order itself is correct, for it is the judgment and not what else may have been said by the lower court that is on appeal to a court of review. A reviewing court may sustain the decision of a lower court on any grounds which are called for by the record regardless of whether the lower court

relied on the grounds and regardless of whether that court's reasoning was correct. See *Rodriguez v. Sheriff's Merit Comm'n*, No. 100165, slip op. at 11 (January 20, 2006); *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983).

In this case, there are numerous reasons, wholly unrelated to the question of jurisdiction, supporting the appellate court's rejection of the government's claim that the circuit court erred in refusing to order Cherry to surrender a portion of his attorney fees. The first is federal law. The Federal Insolvency Statute (31 U.S.C. §3713), on which the government's claim to priority is based, specifically identifies the party who will be held accountable if a debt is paid before a claim of the United States in violation of the statute. It is the representative of the person or estate who paid the money, not the person who received payment. If the representative "pays any part of a debt of the person or estate before paying a claim of the Government" in violation of the law, as the government contends Printy did here, the representative is liable for the government's unpaid claims to the extent of the improper payment. 31 U.S.C. §3713(b) (2000). In accordance with this statute, the circuit court entered judgment against Printy for the sums the government contends were paid out in violation of its statutory priority. Under the circuit court's judgment, and consistent with the federal statute, Printy was held personally liable. The government thus received precisely the remedy to which it was entitled under federal law.

Under a previous version of the Federal Insolvency Statute, personal liability extended beyond representatives of the person or estate indebted to the government. It included executors, administrators, assignees or "any other person[s]" who paid a debt owed by the person or estate before paying debts due the United States. See *King v. United States*, 379 U.S. 329, 333, 13 L. Ed. 2d 315, 318, 85 S. Ct. 427, 429-30 (1964). The statute, as presently enacted, is limited by its terms to the representative of the estate or person, a status that Cherry did not possess. Cherry is merely the representative's attorney. Moreover, even under the prior version of the law, the imposition of personal liability required that the person involved have control and possession of the debtor's assets. *King v. United States*, 379 U.S. at 337-38, 13 L. Ed. 2d at 320-21, 85 S. Ct. at 431-32 . Cherry occupied no such position. While assets of the estate were held in his client trust account for a time, with the approval of

the court, to insure that Printy was not tempted to dispose of them improperly, Cherry was never given and never attempted to exercise independent authority with regard to disposition of any of the assets of Funk's estate. That authority was vested exclusively in Printy.

In addition, the federal courts have long held that a person can be held personally liable under the statute only if he or she has notice of the government's claim and, despite such notice, makes a distribution of the estate without making provision for that claim. See *Want v. Commissioner of Internal Revenue*, 280 F.2d 777, 783 (2d Cir. 1960). That situation was not present here. Cherry did not disregard or ignore a debt of the United States. Assuming, *arguendo*, that his acceptance of payment from Printy for his attorney fees could somehow be deemed to constitute a distribution by him of the estate's assets, it is clear that he had no knowledge, actual or constructive, that the distribution might conflict with any claims asserted by the government. To the contrary, the record plainly shows that when the government asserted its claim under the Federal Insolvency Statute, it expected the costs of administration, including attorney fees, to be paid first. The government so indicated in writing at the outset of the probate proceedings in 1983. Cherry's conduct was fully consistent with the government's notice, and the government's subsequent actions gave no hint that his understanding of its claim was erroneous. Attorney fees and other administration expenses were incurred and paid at regular intervals in the years that followed with no objection by the government. Cherry received his last attorney fee from Printy in 1989. It was not until 1994, five years later, that the government first asserted that costs of administration, including attorney fees, were subordinate to its claims. Under these circumstances, Cherry could not be charged with acting in derogation of the government's position unless he possessed the ability to foretell the future. The Federal Insolvency Statute may require many things, but it does not demand that debtors or their representatives be clairvoyant.

The government's claim against Cherry is also incompatible with fundamental substantive principles governing the Federal Insolvency Statute. Consistent with the statute's broad purpose of securing adequate revenue for the United States Treasury, courts have interpreted it liberally. *United States v. Coppola*, 85 F.3d 1015, 1020 (2d Cir. 1996). The law is clear, however, that the Federal Insolvency

Statute does not create a lien in the government. It merely entitles the government to priority in the payment of its claim when the conditions of the statute have been brought about. *United States v. Gotwals*, 156 F.2d 692, 694 (10th Cir. 1946).

As discussed earlier in this disposition, the statutory priority of the United States extends only to the net proceeds of the estate after the expenses of administration have been paid. Under the statute as it has been consistently interpreted and applied for more than 200 years, expenses of administration take precedence over claims by the federal government. In other words, such expenses are paramount and prior to any claim which the United States may have against the proceeds of the estate as creditor of the deceased. They must therefore be deducted from the funds under the control of the representative of the estate before the claims of the United States are paid. See, *e.g.*, *United States v. Eggleston*, 25 F. Cas. 979, 981 (Cir. Ct. D. Or. 1877).

That does not mean the expenses of administration are beyond challenge. As in every case, such expenses must reasonable and appropriate. In this case, however, there is no dispute that the attorney fees paid to Cherry for his work on behalf of the estate were earned and reasonable in amount. In the face of the documentation adduced in the circuit court by Cherry, the government has long since abandoned any argument to the contrary. Under the Federal Insolvency Statute, Cherry was therefore entitled to all of the attorney fees he was paid for his work on behalf of the estate, including the $38,830.73 challenged by the government in this appeal.

In addition to the general principle that expenses of administration take precedence over the claims of the federal government, the Federal Insolvency Statute is also subject to the equitable principle " 'that he who shares in a benefit should contribute a like share to the expenses incurred in realizing the benefit.' " *Abrams v. United States*, 274 F.2d 8, 13 (8th Cir. 1960), quoting *In re Kennedy*, 14 Fed. Cas. 309, 309 (W.D. Pa. 1873). In accordance with this equitable principle, creditors, including the United States government, must bear the expenses of proceedings taken in their favor, including payment of an attorney retained by the debtor for services performed in furtherance of the insolvency remedy. The test is not by whom the attorney has been employed but for whose benefit

he has acted. It has therefore been held that where an the attorney's work in connection with the proceedings inures to the benefit of the United States, no construction of the Federal Insolvency Statute is tenable which would allow the government's claim to take precedence over the amounts due the attorney. *Abrams v. United States*, 274 F.2d at 13.

The matter before us falls squarely within this rule. After Cherry completed the preliminary work on behalf of the estate, work for which his payment is not challenged, his efforts centered on assisting Printy in keeping the estate open and the farm operating until Michael attained his majority and the land could be sold. Although it was Printy who retained Cherry, the arrangement was patently not for Printy's benefit. She clearly had no interest in undertaking, much less extending, her responsibilities as executor and would unquestionably have been better off had the government simply foreclosed. As discussed earlier in this opinion, the work was done as an accommodation to the United States, it significantly enhanced the ability of the government to recoup monies it was owed, and it freed the government from any risk or responsibility in maintaining and ultimately disposing of the farmland. It was Cherry who made this possible. Having thus reaped the fruits of Cherry's labors, the United States cannot fairly argue that its claims take precedence over his right to be paid for his services.

The refusal of the circuit and appellate courts to order Cherry to surrender a portion of his fees to the federal government was not only correct under federal law, it was also correct under the law of the State of Illinois. Under Illinois law, priority for payment of claims against a decedent's estate is determined by the classification scheme set forth in section 18–10 of the Probate Act of 1975 (755 ILCS 5/18–10 (West 2004)). As discussed earlier in this opinion, funeral and burial expenses and expenses of administration, including attorney fees, are included in the first class of claims against the estate. The surviving spouse's or child's award is ranked second. Debts due the United States come third. With one exception not relevant here, the representative of the estate is required to pay claims against the estate in order of their classification under this system. 755 ILCS 5/18–13 (West 2004).

In accordance with the foregoing provisions, Printy had no choice but to pay the costs of administration, including Cherry's attorney fees, before the debts due the United States under the four promissory notes executed by her husband prior to his death. That is precisely what she did. Because her actions conformed to the statute, the government cannot contend that the attorney fees Printy paid to Cherry, which it now admits were earned and reasonable, should have been subordinated to the sums it claims it was still owed. It held only a third-class claim. Cherry's attorney fees were a first-class claim. For the government's claim to take precedence over Cherry's would therefore have required that the hierarchy established by the Probate Act be reversed. That is a result the courts cannot sanction. Where a statute is clear and unambiguous, as the relevant provisions of the Probate Act are, a court must give it effect as written without reading into it exceptions, limitations, or conditions that the legislature did not express. *Land v. Board of Education of the City of Chicago*, 202 Ill. 2d 414, 426 (2002).

The government sought to avoid its subordinate position under the Probate Act by arguing that the security interests it obtained when it issued the loans to Funk barred Printy from using the proceeds from the sale of the collateral for any purpose other than repayment of the debt due the United States. Although the appellate court found the government's argument persuasive when, in a divided decision, it reversed the circuit court's order of February 10, 2000, and remanded for another round of proceedings (see *In re Estate of Funk*, No. 4–00–0178 (2000) (unpublished order under Supreme Court Rule 23)), its analysis is untenable given the facts of this case.

The government's argument is premised on a number of Illinois cases which have held that where property left by a decedent is subject to a lien, the property does not become an asset of the estate until the creditor's lien is discharged. See *Furness v. Union National Bank of Chicago*, 147 Ill. 570, 573-74 (1893); *King v. Goodwin*, 130 Ill. 102, 109-10 (1889); *In re Estate of Philp*, 114 Ill. App. 3d 107, 111 (1983); *In re Estate of Yealick*, 69 Ill. App. 3d 353, 355 (1979). Wholly aside from the fact that none of those decisions involved a situation subject to the Federal Insolvency Statute, we note that none directly addressed the situation presented by this case, namely, whether a creditor's security interest in property entitles it to jump ahead of claims for expenses of administration that would otherwise

fall within a higher classification under the Probate Act. The distinction is critical. A valid security interest unquestionably gives a creditor preference over unsecured creditors within the same or lower statutory class under the Probate Act. That does not necessarily mean, however, that the secured creditor is entitled to trump those whose claims fall within a higher class. To the contrary, it has been held that the fact that a claim is secured by a lien upon real or personal property gives the claimant no superior rights in the matter of classifying claims. 6 Ill. Jur., *Probate, Estates & Trusts* §29:20 (2001), citing *Lillard v. Noble*, 159 Ill. 311, 320 (1896).

Such a rule works no genuine hardship on secured creditors in cases such as this, where the competing superior claims consist of the expenses of administration. Although expenditures for the expenses of administration mean that secured creditors stand to receive less than they might otherwise, the administration of the estate benefits them by preserving the property until it can be disposed of, facilitating the property's sale and ensuring that the proceeds are properly collected and disbursed. Without proper administration of the estate, creditors' ability to satisfy their claims would, in fact, be seriously compromised. If a secured creditor does not wish to avail itself of those benefits, it retains the option of undertaking foreclosure proceedings on its own. Nothing in the Probate Act forecloses that remedy. It was available to the United States in this case. Having elected to forgo that remedy and permit the estate to manage and dispose of the subject property, the government cannot now contend that its third-class claim should have eclipsed the first-class claim for administration expenses of which Cherry's attorney fees were an integral part.

The government's reliance on cases such as *Furness v. Union National Bank of Chicago*, 147 Ill. 570, 573-74 (1893), is misplaced for another reason as well. As we have just suggested, the government cites those decisions for the proposition that where property left by a decedent is subject to a creditor's lien, the property does not become an asset of the estate and should therefore not be used to pay claims against the estate until the lien is discharged. Assuming the validity of that proposition, it does not aid the government's position in this case. The government's security interests pertained to four loans. Through Printy's efforts as executor of the estate, loans two through four were completely paid off. The

promissory notes were returned by the government in 1985 marked "paid in full." The government's security interest in the subject collateral was extinguished and its liens were discharged. As a result, any claim the government might have pertaining to loans two through four ended. The government therefore has no basis for asserting that monies paid to Cherry for attorney fees should have been applied to those loans instead.

To be sure, the remaining loan, which involved the mortgage on the farm, was not paid in full. Nevertheless, the record clearly shows that before proceeds from the sale were paid over to Printy, as executor, and used to pay expenses of administration, including Cherry's final charge for attorney fees, the government expressly released its security interest in the subject property. The release did not extinguish any part of the debt. The government retained its right to claim proceeds from the sale and demand payment in full when the proceeds proved inadequate to satisfy the balance due on the promissory note. Without the lien, however, the predicate for treating the proceeds as anything other than assets of the estate was gone. Accordingly, while the government's claim remained superior to claims of all other creditors, it was subordinate to the expenses of administration, including attorney fees. The government's contention that $38,830.73 of the fees paid to Cherry constituted an improper application of secured proceeds must therefore fail.

In its order of July 23, 1998, and its subsequent order of February 10, 2000, following remand from the appellate court, the circuit court carefully considered the record and applied the applicable law to conclude, correctly, that the costs of administration claimed by Printy, including the attorney fees paid to Cherry, were proper and should be approved. Although the court subsequently changed its position and deemed the fees to be disallowed, that characterization was wholly unrelated to the validity of the fees themselves. As we have noted at various points in this opinion, the government concedes that the fees were earned and were reasonable.

The sole basis for the circuit court's decision to disallow the fees was the belief that the government had first claim to the funds used to pay the fees and that without those funds, the estate lacked sufficient resources to pay the fees. For the reasons just discussed, that belief

was erroneous. The claims of the United States did not take priority over Cherry's rights to be paid for his services on behalf of the estate.

We feel constrained to point out, moreover, that the circuit court's decision presupposes that a claim against the estate cannot be allowed unless a showing is first made that the estate has the resources to pay it. The government has not cited and we have not found any provision of the Probate Act or any case law to support that view. Whether a claim should be allowed turns on its validity, not on whether there is money to satisfy it. Whether resources exist to pay the claim is a separate inquiry to be made by the executor, in the first instance, subject to challenge by interested persons, based on the priorities established under the Probate Act. See 755 ILCS 5/18–11, 18–13 (West 2004).

These principles were recognized by the executor and by the circuit judge who presided over this case in its early stages. That is why, in the fall of 1984, the court considered and allowed a total of $102,857.59 in seventh-class claims notwithstanding the fact that the insolvency of the estate was already apparent and it was why Printy did not pay those claims even though they had been allowed. That Printy and the circuit court acted properly with respect to those claims has never been questioned. Why the circuit court took a different view with respect to Cherry's attorney fees is unknown. In any case, those fees were properly allowed by the circuit court in the first instance and should not have been subsequently disallowed.

By the time the circuit court changed its position and declared Cherry's fees to be disallowed, Cherry had withdrawn from the case based on his election as State's Attorney of Scott County and Printy was left without legal representation or the resources to retain any. As a result, no objection to the court's determination was filed. Based on the absence of a timely objection, the government asserts that the circuit court's determination that fees were disallowed is no longer subject to challenge. We note, however, that what is before us on review is the appellate court's judgment affirming that aspect of the circuit court's judgment which refused to order Cherry to surrender any of his attorney fees. As set forth at the outset of our analysis in this case, we are not bound the reasons given by the lower courts for their judgments and may affirm on any grounds which are called for by the record. See *Rodriguez v. Sheriff's Merit Comm'n*, slip op. at

11; *Material Service Corp. v. Department of Revenue*, 98 Ill. 2d 382, 387 (1983).

The same $38,830.73 in attorney fees which the government sought to recover from Cherry is a component of the $90,092.66 judgment the government ultimately succeeded in obtaining against Printy based on expenditures she made in her capacity as executor of Funk's estate. In view of our conclusion that the expenses of administration were properly given priority over the debts of the United States under the facts of this case, allowing the judgment against Printy to stand would therefore place that judgment in an irreconcilable conflict with the judgment in favor of Cherry. If Printy acted properly in paying the fees to Cherry, as we have held she did, she cannot be held personally liable to the United States for making that payment.

Because Printy did not challenge the portion of the judgment imposing liability on her, we would normally deem her rights on appeal to be waived. The rule of waiver, however, is an admonition to the parties, not a limitation on the jurisdiction of this court. See *People v. Normand*, 215 Ill. 2d 539, 544 (2005). We may look beyond considerations of waiver in order to maintain a sound and uniform body of precedent or where the interests of justice so require. *Carpetland U.S.A., Inc. v. Illinois Department of Employment Security*, 201 Ill. 2d 351, 397 (2002). This is such a case.

In addition to the need to avoid an inconsistent and legally infirm result, other factors militate in favor of scrutinizing that aspect of the judgment involving Printy. The earlier rulings of the circuit court approving her accounting, closing the estate and discharging her as executor were entered following evidentiary hearings based on pleadings submitted in accordance with the Probate Act, and tested by the adversarial process. By contrast, the judgment ultimately levied against her was premised on an accounting that was submitted by an entity not authorized by the Probate Act to act for the estate, not verified as the Probate Act requires, and prepared by an attorney who had no personal knowledge of any of the salient events and who had not entered the case until years after the estate's assets were finally disposed and the disputed claims had been paid. Moreover, by the time the new accounting was presented, Printy had lost her legal representation and lacked the means for securing replacement

counsel, leaving the account to be considered free of meaningful challenge. In proceeding to consider the judgment against Printy, we are also mindful of the power conferred on this court by article VI, section 16 of the Illinois Consitution of 1970 (Ill. Const. 1970, art. VI, §16). Article VI, section 16, invests our court with general administrative and supervisory authority over Illinois' judicial system. Our court's supervisory authority is unlimited in extent and hampered by no specific rules or means for its exercise. It is bounded only by the exigencies which call for its exercise. Pursuant to our supervisory authority, we have jurisdiction to evaluate judgments of the lower courts even where the litigants themselves may have raised no challenge. *McDunn v. Williams*, 156 Ill. 2d 288, 301-04 (1993).

When one views the judgment against Printy on the merits, it is clear that it must be rejected in its entirety. As we have indicated, the judgment, which amounted to $90.092.66, is based on various payments made by Printy in her capacity as executor and opposed by the government, including payments to Cherry for legal services he performed on behalf of the estate. As with Cherry's attorney fees, the government does not dispute the reasonableness of those payments. Its contention is simply that it had a superior claim to the money used to make the payments and that Printy should have paid it first.

The particular sums at issue are detailed earlier in this opinion. The majority consist of expenses attendant to administering the estate, including the challenged attorney fees paid to Cherry, the fees Printy received for her services as executor, taxes, bank fees, and costs pertaining to sale of the real estate. As with Cherry's attorney fees, all of these expenses were a necessary and unavoidable consequence of keeping the estate open and continuing operation of the farm, an arrangement which benefitted only the government, not Printy. Had the government wished to avoid such expenses, it could have foreclosed on the property and taken over the farm operations itself. It was unwilling to do so. For the same reasons set forth in connection with Cherry's attorney fees, these expenses of administration had priority over the government's claims under both federal and state law.

The remaining sums consisted of a portion of Printy's surviving spouse award and a portion of the surviving child's award made to Michael, Printy and Funk's then minor child. No legitimate claim can

be made that those payments, which were made in 1983 and 1984, were in derogation any of the federal governments security interests. As previously discussed, loans two through four were paid off in full, and the security interests attendant to those loans were extinguished and released. Moreover, Printy could not be accused of using "secured proceeds" from the farm to pay those amounts because the farm had not yet been sold, and when it was sold, the government released its liens before any proceeds reached Printy.

Awards to surviving spouses and minor children take priority over debts of the United States under the Federal Insolvency Statute. Where, as here, no security interests are involved, there can be no question that they are also entitled to a higher classification than debts due the United States under section 18–10 of the Probate Act of 1975 (755 ILCS 5/18–10 (West 2004)). In addition, the particular awards at issue here were reported by Printy in prior accounts which were presented to the court, with notice to the United States, and approved without objection following a hearing. Absent fraud, accident or mistake the approval of an account makes it binding on all persons who had notice. See *In re Estate of Winston*, 99 Ill. App. 3d 278, 286 (1981). No fraud, accident or mistake was claimed in this case. The approval of those sums was therefore binding on the government, which should not have been permitted to challenge the approval for the first time more than a decade after the fact. See 755 ILCS 5/24–2 (West 2004); *In re Estate of Aschauer*, 188 Ill. App. 3d 63, 68 (1989).

For the foregoing reasons, the circuit court's judgment against Printy and in favor of the United States for $90,092.66 is reversed. That portion of the appellate court's judgment which affirmed the judgment against Printy is likewise reversed. The judgments of the circuit and appellate courts are affirmed to the extent that they rejected the claim of the United States that Cherry should be compelled to surrender $38,830.73 of the attorney fees he was paid for his legal services in assisting Printy to administer the estate. The estate is hereby closed. Printy is discharged as executor.

*Appellate court affirmed in part*
*and reversed in part;*
*circuit court affirmed in part*

JUSTICE GARMAN took no part in the consideration or decision of this case.

JUSTICE FREEMAN, concurring in part and dissenting in part:

I agree with my colleagues in the majority that the circuit court did not err in denying the United State's request to hold the attorney personally liable for the $38,830.73. The court today holds that such a ruling was correct because the United States did not have first claim to the funds used to pay the fees. Slip op. at 51. I concur in that holding.

In my view, the holding I describe above is the only one that can be made in this case because the sole issue before this court is limited to whether it was error to deny the United States' request to hold the attorney personally liable. Since the entry of the judgment in the circuit court, no party but the United States has questioned the propriety of the circuit court's final order.[12] Thus, while I agree with my colleagues that today's rationale is in "irreconcilable conflict" with the remainder of the circuit court's order as it pertains to other aspects of this estate (slip op. at 52), I believe that they act well beyond the scope of this appeal when they insist upon reaching portions of the judgment which are not before us, in particular the judgment entered against the executrix. As the court acknowledges, the executrix did not appear in the proceedings leading up to the entry of the judgment or challenge the judgment on appeal. The court justifies its actions by pointing out that it can look beyond considerations of waiver in order to maintain a sound and uniform body of precedent or whether the interests of justice so desire. Slip op. at 53. The court also says that it must act in this manner because of several improprieties that occurred during the probate proceedings below, as if to suggest that such irregularities render the heretofore unchallenged aspects of the circuit court's judgment subject to plenary review in this court. Slip op. at 53. Finally, the court invokes its supervisory authority, a power described as being "bounded only

---

[1]It is unclear from the court's opinion under which supreme court rule this appeal was taken.

by the exigencies which call for its exercise" (slip op. at 53) as further justification for its action. The court therefore appears to employ three different rationales as support for its decision to address the unchallenged aspects of the circuit court's order, none of which I find particularly persuasive after carefully considering the record in this case.

I believe a remand would better solve the problem caused by the "irreconcilable conflict" between our holding and the circuit court's final order. Today's opinion would serve to provide the circuit court and the parties with the correct legal analysis that is to be used when considering the final account of this estate. Moreover, the procedural irregularities evinced by the record and pointed out by the court *sua sponte* in its opinion lead me to believe that it is unwise for this court to attempt to take matters into its own hands, however laudable its intentions are for a final resolution of this lengthy and protracted litigation. While the situation in this case is highly unusual, I do not believe it warrants the extraordinary use of our supervisory authority to reach those aspects of the court's order which deal with the executrix. Slip op. at 53. The more prudent and judicious course of action is to remand the matter to the circuit court with specific instructions to reconsider its entire final account of the estate and judgment in light of this opinion, particularly in light of the conflicts between accounts. I therefore would order the circuit court to (i) reopen the estate, (ii) appoint the public administrator to protect the interests of the estate and the widow/executrix, (iii) order the public administrator to review the final account prepared in this case in light of today's opinion, and (iv) enter a final order, consistent with today's opinion and closing the estate, upon receipt of the public administrator's review within 90 days of the issuance of this court's mandate.