# Illinois Official Reports

## Appellate Court

---

***Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange***, 2018 IL App (1st) 171316

---

| | |
|---|---|
| Appellate Court Caption | PLATINUM PARTNERS VALUE ARBITRAGE FUND, LIMITED PARTNERSHIP, and PLATINUM PARTNERS LIQUID OPPORTUNITY FUND, LIMITED PARTNERSHIP, Plaintiffs-Appellants, v. CHICAGO BOARD OPTIONS EXCHANGE and OPTIONS CLEARING CORPORATION, Defendants (Options Clearing Corporation, Defendant-Appellee). |
| District & No. | First District, Fourth Division<br>Docket No. 1-17-1316 |
| Filed | March 29, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-CH-54472; the Hon. Michael T. Mullen, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Marvin A. Miller and Andy Szot, of Miller Law LLC, of Chicago, and Sanford P. Dumain, of Milberg Tadler Phillips Grossman LLP, of New York, New York, for appellants.<br><br>William J. Nissen, Steven E. Sexton, and Mark C. Brown, of Sidley Austin LLP, of Chicago, for appellee. |

JUSTICE GORDON delivered the judgment of the court, with opinion.
Presiding Justice Burke and Justice McBride concurred in the judgment and opinion.


**OPINION**

¶ 1 In the case at bar, the trial court denied a motion for summary judgment by defendant Chicago Board Options Exchange (CBOE) but granted summary judgment for defendant Options Clearing Corporation (OCC). Although this suit continues below, we have jurisdiction to hear this appeal, since the trial court entered a finding pursuant to Illinois Supreme Court Rule 304(a) (Ill. S. Ct. R. 304(a) (eff. Mar. 8, 2016)) that there was no just reason to delay the appeal of the summary judgment granted in favor of defendant OCC.

¶ 2 This court previously reviewed this same case, when the trial court previously dismissed it on the ground that defendants were shielded from suit under the doctrine of regulatory immunity. *Platinum Partners Value Arbitrage Fund, Ltd. Partnership v. Chicago Board Options Exchange*, 2012 IL App (1st) 112903, ¶ 2. This court reversed the trial court's dismissal, stating: "Where defendants privately disclose information about the price adjustment of a stock option to selected market participants before that information is made publicly available, the doctrine of regulatory immunity does not apply." *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 2.

¶ 3 In addition, we found that the trial court had erred in dismissing plaintiffs' complaint pursuant to section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2010)), because the complaint had stated multiple causes of action. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 30. This court found that plaintiffs had sufficiently pled a cause of action against both defendants with respect to all of their claims: (1) violation of the antifraud provision in section 12(F) of the Illinois Securities Law of 1953 (815 ILCS 5/12(F) (West 2002)); (2) violation of the antifraud provision in section 12(I) of the Illinois Securities Law of 1953 (815 ILCS 5/12(I) (West 2002)); (3) violation of the Illinois Consumer Fraud and Deceptive Business Practices Act (815 ILCS 505/10a(a) (West 2002)); and (4) common law fraud. *Platinum Partners*, 2012 IL App (1st) 112903, ¶¶ 21, 26-29.

¶ 4 After this court remanded the case to the trial court, the trial court subsequently granted summary judgment to defendant OCC on the sole ground of regulatory immunity. The trial court stated that it "need not reach the merits of Plaintiffs' claims against OCC. Instead of determining whether Plaintiffs have proven their causes of action, this Court instead holds that the doctrine of regulatory immunity precludes liability for any cause of actions based on OCC's activities." *Platinum Partners Value Arbitrage Fund v. Chicago Board Options Exchange, Inc.*, No. 10-CH-54472 (Cir. Ct. Cook County Dec. 20, 2016).

¶ 5 On appeal, plaintiffs claim that the trial court disregarded this court's prior opinion in this case and erred in finding that defendant OCC's conduct in this case was entitled to regulatory immunity. For the following reasons, we reverse and remand for further proceedings.

BACKGROUND

I. Undisputed Facts and Our Prior Opinion

¶ 8     The following facts are not in dispute. Plaintiffs are Cayman Islands investment funds. Plaintiffs invested in options for shares of the India Fund, Inc. (IFN), a fund that invests in the stock of companies located in India. IFN options were traded by defendant CBOE, and defendant OCC cleared and settled the trades. At issue in the case at bar is plaintiff's investment in "put" options that gave it the right to "put" or sell IFN shares to an option seller at a predetermined price, called the "strike price." The value of the option depended on how much more the strike price was than the regular price of IFN shares.

¶ 9     On Friday, December 17, 2010, plaintiff held approximately 25,000 IFN options. After the market closed on December 17, 2010, IFN announced a capital gains distribution to its shareholders of $3.78 per share. The rules of defendants CBOE and OCC permit an adjustment to the strike price of options to account for such a distribution. To account for the negative impact that a distribution of a corporation's assets generally has on the value of its stock, an option's strike price may be adjusted downward. Defendant OCC's published guidelines state that adjustments are made on a "case by case basis."

¶ 10    On Monday, December 20, 2010, plaintiff purchased more than 50,000 additional put options for IFN stock. During the afternoon of December 20, 2010, defendants CBOE and OCC publicly announced a downward adjustment of $3.78 to the strike price of IFN options, resulting in a loss to plaintiffs. The events preceding this public announcement are the subject of this lawsuit.

¶ 11    In essence, defendant argues on appeal primarily that plaintiffs should have known that the strike price would be adjusted and that other investors already knew, while plaintiffs argue that, although an adjustment was permitted, it was not required, and that defendant OCC privately disseminated news of the adjustment to a few investors prior to the public announcement. Thus, defendant points to documents suggesting that plaintiffs should have known, while plaintiffs point to documents showing that defendant privately disseminated information.

¶ 12    However, as we discuss below,[1] whether or not plaintiffs should have known has no impact on the question of whether defendant's acts, if any, of private dissemination are entitled to regulatory immunity. What plaintiff knew or should have known could possibly affect questions concerning damages or causation or other elements but it does not affect the threshold question of whether there were private acts of dissemination and, if there were, whether these acts were entitled to regulatory immunity. As a result, we describe below the evidence relating to these threshold questions, which were the only questions on which the trial court ruled. The trial court stated explicitly that it did not reach the merits of plaintiffs' causes of action and that it ruled for defendant OCC solely on the ground that its acts were shielded by regulatory immunity. *Platinum Partners*, No. 10-CH-54472.

¶ 13    The question of whether plaintiffs knew or should have known, or should have been able to predict, the upcoming price adjustment is a question of fact that may be material to the issue of damages or causation or possibly other elements of plaintiffs' claims, but it is unrelated to (1) the factual question of whether defendant OCC privately disseminated information and (2) the

---

[1]*Infra* ¶ 48.

solely legal question of whether private disseminations, if any, are protected by regulatory immunity. This court already answered the second, purely legal question in our last opinion: private disseminations are not protected by regulatory immunity. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 2 ("Where defendants privately disclose information about the price adjustment of a stock option to selected market participants before that information is made publicly available, the doctrine of regulatory immunity does not apply."). Thus, the only question left in this case with respect to regulatory immunity is the first, factual question of whether private dissemination occurred.

¶ 14                    II. Evidence Concerning Private Dissemination

¶ 15        The subjects of this suit are statements made by employees of defendant OCC during private telephone calls or emails with investors other than plaintiffs. These employees included both members of defendant OCC's help desk and its national operations group. The national operations group administers the options adjustment process. In December 2010, when the relevant events occurred, John Peplinski was the vice president of the national operations group, and Kenneth Rypel was a director of corporate actions who reported to Peplinski. The help desk provides information about the trading of options and about defendant OCC's bylaws and adjustment rules. In December 2010, defendant OCC's website listed a toll-free number and an email address for its help desk.

¶ 16        Prior to IFN's announcement on Friday, December 17, 2010, of a capital gains distribution, employees of both the help desk and the national operations group gave varying answers to investors who contacted them, including that, if IFN announced a capital gains distribution, defendant OCC would "probably" adjust the stock price. There is no dispute about this fact on this appeal.

¶ 17        However, on Monday, December 20, 2010, after IFN announced its capital gains distribution but before defendant OCC's public announcement of a strike price adjustment, the help desk and national operations employees indicated in various private conversations with investors that defendant OCC was going to adjust the strike price, stating that the adjustment was expected or anticipated or simply, flat out, that "there will be an adjustment." Again, there is no dispute about this fact on this appeal, and we provide detailed examples below.

¶ 18                                A. Help Desk

¶ 19        Disclosures made by the help desk after IFN's announcement on December 17 but before defendant's announcement on December 20 included the following.

¶ 20        An audio recording produced by defendant OCC showed that at 7:57 a.m. on December 20, 2010, a caller[2] to the help desk spoke with Jeffrey Huddleston, a help desk employee.[3] The caller stated that he was looking at IFN and wondered whether there was going to be an adjustment. Huddleston stated that his "guess is probably yes," but he would "see if [he] can get a confirmation." Huddleston then put the caller on hold and contacted Marla Turner in

---

[2]The parties filed a secured record in order to protect the identities of third parties who are not parties to this appeal. Thus, we will refer to the callers simply as callers rather than identifying them by name.

[3]Huddleston testified that he had been employed with defendant OCC for 23 or 24 years and left in October 2011.

national operations, who confirmed that there would be an adjustment but she did not know whether it would be announced that day or the next. Huddleston returned to the caller and stated that, while they were not certain whether the announcement would be made that day, "there will be an adjustment." The caller then asked: "So the memo is either gonna go out today or tomorrow; but for sure, there's gonna be an adjustment?" To which, Huddleston replied: "Correct."

¶ 21 Another audio recording produced by defendant OCC shows that another caller contacted the help desk at 8:19 a.m. on December 20, 2010, and spoke with Huddleston. The caller asked about IFN and Huddleston immediately replied that "there will be an adjustment" and "we hope to have a memo out either today or tomorrow." Then the caller asked: "You knew that right off the bat. Have you been getting a lot of calls on it?" Huddleston replied, "Yes, we have." The two then had the following conversation:

> "CALLER: Okay. But when—let me ask you a question. When you say, 'It's my understanding,' I'm assuming you spoke to—
>
> HUDDLESTON: To our operations area.
>
> CALLER: And they said. This will be adjusted.
>
> HUDDLESTON: You know what—
>
> CALLER: They anticipate it to be adjusted.
>
> HUDDLESTON: Let's put the—let's use the word 'anticipate.'
>
> CALLER: Yes.
>
> HUDDLESTON: Because, you know, they—you know, before it actually comes out, I know they're—they're like, you know what, we don't want it—it's not official until it's official. So they anticipate adjusting for it."

¶ 22 Another audio recording produced by defendant shows that at 9 a.m. on December 20, 2010, Darren Tait, another help desk employee,[4] informed yet another caller to "expect a memo in the near future."

¶ 23 After listening to an audio recording of Huddleston responding to a caller asking about IFN, John Peplinski, defendant's vice president of the national operations group, testified at his deposition:

> "PEPLINSKI: [W]e had a clear understanding in the corporate actions area and with the Help Desk that—that—that any—prior to any—the decision having been made, that no communications was—were to take place with the—with the outside. Opinions were not to be given as to whether—the likelihood of an adjustment or not."

¶ 24 Peplinski testified: "[I]t was a violation of our understanding that [Huddleston] should not have ventured his opinion as to the adjustment to an outside investor." Peplinski explained: "His job is not to offer or to give investment guidance or to offer opinions as to corporate actions that may or may not take place."

¶ 25 Similarly, Denise Knabjian, defendant's director of internet and investor services,[5] testified at her deposition that several help desk employees, including Huddleston and Tait,[6]

---

[4]Tait testified at his deposition that he had worked with defendant OCC since July 2005 and was still employed there and that in December 2010, when these events occurred, he was a "senior investor service specialist," whose primary job was to answer telephone calls.

"received a warning" as a result of the events surrounding the adjustment of IFN options "[f]or failure to adhere to guidelines." With respect to Huddleston, Knabjian testified:

"KNABJIAN: Our guidelines state that you are not supposed to speculate as to whether an adjustment will or will not occur, and he gave explicit—my recollection is that he gave explicit direction that it was going to be adjusted."

With respect to Tait, Knabjian explained that he received a warning because "he didn't provide the qualifying information that says each one is handled on a case-by-case basis so, essentially, [he] didn't adhere to the spirit of the guidelines." Knabjian stated that Joseph Harwood, who was the direct supervisor for both Huddleston and Tait, also received a written warning for a "failure to manage" because "there was an opportunity to correct the problem" and he failed to do so.

¶ 26                                    B. Disclosures Outside the Help Desk

¶ 27        Disclosures made outside of the Help Desk included the following: Kenneth Rypel, a director of corporate actions,[7] identified in his deposition an email that he had sent to a market participant who had asked him when defendant OCC would make the IFN price adjustment. In Rynel's email, which was sent on December 20, 2010, at 10:07 a.m., he indicated that defendant OCC would affect the price adjustment on December 29. John Peplinski, vice president of defendant's operations group,[8] testified at his deposition that the time of this email was before the strike price adjustment of IFN options was publicly announced.

¶ 28                                    III. Trial Court's Memorandum Order

¶ 29        On December 20, 2016, the trial court granted defendant OCC's motion for summary judgment on the sole ground that defendant's actions were protected from suit by the doctrine of regulatory immunity. *Platinum Partners*, No. 10-CH-54472.[9] The trial court explicitly and repeatedly stated that it was not reaching the merits of any of plaintiffs' causes of action against defendant OCC as a result. *Platinum Partners*, No. 10-CH-54472.

¶ 30        The trial court found, as a matter of law, that the only way that defendant OCC's disclosures would *not* be shielded by the doctrine of regulatory immunity is if the disclosures

---

[5]Knabjian testified at her deposition that she had been employed with defendant OCC for 18 years and that in December 2010, when these events occurred, she was the director of internet and investor services. While Harwood managed the "day-to-day" activities of the help desk, he "reported up through [Knabjian] for overall direction for the team."

[6]Knabjian testified that Huddleston and Tait reported to Joe Harwood who reported to her.

[7]Rypel testified at his deposition that he had been employed with defendant OCC for 35 years until resigning in March 2011. During December 2010, when the events of this suit occurred, he was director of corporate actions.

[8]Peplinski testified at his deposition that he was employed by defendant from 1981 until April 2014 and that his position in December 2010, when these events occurred, was vice president of the national operations group.

[9]Prior to the trial court's summary judgment ruling, a different trial judge had denied defendants OCC and CBOE leave to amend their answers to add the affirmative defense of regulatory immunity, on the ground that this court's opinion removed that issue from the case. However, the parties raise no issues on appeal with respect to this prior memorandum opinion by the trial court on June 23, 2015.

were *both* (1) "non-public" and (2) for defendant OCC's own corporate benefit. *Platinum Partners*, No. 10-CH-54472.

¶ 31    Reviewing the relevant evidence, the trial court observed that "[e]ach party points to distinct instances in which market participants and [defendant] OCC help-desk employees testified that help-desk employees informed some market participants that there would be an adjustment to the strike price of IFN options before the [p]ublic [a]nnouncement." *Platinum Partners*, No. 10-CH-54472. The trial court described a number of these calls and then noted that defendant "OCC does not dispute the content of any of the conversations." *Platinum Partners*, No. 10-CH-54472. Instead, defendant OCC disputed plaintiffs' characterization of these calls as "private disclosures for OCC's corporate benefit." *Platinum Partners*, No. 10-CH-54472.

¶ 32    The trial court found that (1) "the disclosures were certainly non-public" and (2) they were *not* for defendant OCC's own corporate benefit. *Platinum Partners*, No. 10-CH-54472. In reaching the second conclusion, the trial court found that (1) there was "no indication that [defendant] OCC precluded non-members from reaching out and obtaining the same information at issue," (2) defendant OCC operated as a not-for-profit business, and (3) there could have been no intent to benefit OCC, since disclosures would have reduced trading. *Platinum Partners*, No. 10-CH-54472. Thus, the trial court concluded that the doctrine of regulatory immunity applied and granted summary judgment for defendant OCC.

¶ 33    On April 24, 2017, the trial court entered an order pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016), finding that there was no just reason for delaying either enforcement or appeal or both of the judgment in favor of defendant OCC alone. On May 23, 2017, plaintiffs filed a timely notice of appeal, and this appeal followed.

¶ 34                                    ANALYSIS

¶ 35    On appeal, plaintiffs claim that the trial court disregarded this court's prior opinion in this case and erred in finding that OCC's conduct in this case was entitled to regulatory immunity. We agree. For the following reasons, we reverse and remand for further proceedings.

¶ 36                              I. Procedural Posture

¶ 37    Although this court previously found that defendants were not entitled to regulatory immunity, the procedural posture at that time was different. At that time, we were reviewing the trial court's dismissal pursuant to section 2-615 of the Code of Civil Procedure. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 12. When we review a trial court's decision pursuant to section 2-615, we must consider all well-pled factual allegations in the complaint as true, and we must draw all reasonable inferences from those facts in favor of plaintiffs. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 12. In our prior opinion, we assumed, as we were required to do at that time, that all the factual allegations in plaintiffs' complaint were true. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 12. Based on that assumption, we found that the complaint stated multiple causes of action. *Platinum Partners*, 2012 IL App (1st) 112903, ¶¶ 26-29.

¶ 38    By contrast, in the present appeal, we are reviewing a dismissal pursuant to section 2-1005 (735 ILCS 5/2-1005(c) (West 2016)), which means that we consider more than just the factual allegations in the complaint. Section 2-1005 permits a trial court to grant summary judgment

only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." 735 ILCS 5/2-1005(c) (West 2016).

¶ 39 Summary judgment is a drastic measure that should be granted only if the movant's right to judgment, as a matter of law, is clear and free from doubt. *A.M. Realty Western L.L.C. v. MSMC Realty, L.L.C.*, 2016 IL App (1st) 151087, ¶ 85; *Pekin Insurance Co. v. Roszak/ADC, LLC*, 402 Ill. App. 3d 1055, 1059 (2010); see also 735 ILCS 5/2-1005(c) (West 2016) (summary judgment may be granted only if "the moving party is entitled to a judgment as a matter of law"). In making this determination, the court must view the relevant documents in the light most favorable to the nonmoving party. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 85; *Pekin Insurance*, 402 Ill. App. 3d at 1058-59. In addition, if "the grounds for the trial court's grant of summary judgment contradict our prior opinion, *** we must reverse." *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 94. If a "conclusion" by the appellate court "was a necessary step" in a prior opinion in the same case, then it is "a part of our holding" and binding on the trial court. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 90.

¶ 40 A defendant moving for summary judgment bears the initial burden of proof. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86; *Erie Insurance Exchange v. Compeve Corp.*, 2015 IL App (1st) 142508, ¶ 15. The defendant may meet its burden of proof either by affirmatively showing that some element of the case must be resolved in its favor or by establishing the absence of evidence to support the nonmovant's case. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86; *Erie Insurance*, 2015 IL App (1st) 142508, ¶ 15. As for the plaintiff who is trying to withstand a summary judgment motion, he " ' "need not prove his case at this preliminary stage but must present some factual basis that would support his claim." ' "*A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86 (quoting *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002), quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)).

¶ 41 As with the review of a section 2-615 dismissal, the review of summary judgment requires no deference to the trial court. The standard of review remains the same: *de novo*. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 87; *Pekin Insurance*, 402 Ill. App. 3d at 1059. *De novo* consideration means that we perform the same analysis that a trial judge would perform. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 87; *Erie Insurance*, 2015 IL App (1st) 142508, ¶ 14.

¶ 42                                  II. Doctrine of Regulatory Immunity

¶ 43 There is no dispute in the case at bar that defendant OCC is a " 'self-regulatory organization' " as defined by the United States Code (15 U.S.C. § 78c(a)(26) (2012)). "The term 'self-regulatory organization' [(SRO)] means any national securities exchange, registered securities association, or registered clearing agency ***." 15 U.S.C. § 78c(a)(26) (2012). In the case at bar, defendant OCC is a clearing agency.

¶ 44 There is also no dispute that an SRO and its officers are entitled to absolute immunity when they act within the scope of their regulatory duties. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15. This doctrine of regulatory immunity, as it is known, provides SROs with the freedom to exercise the discretion given to them without fear of retaliatory litigation. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15.

¶ 45 However, as this court explained previously, SROs do not have complete immunity from lawsuits. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15. Since "the law favors providing legal remedy to injured parties, grants of [regulatory] immunity must be narrowly construed."

*Weissman v. National Ass'n of Securities Dealers, Inc.*, 500 F.3d 1293, 1297 (11th Cir. 2007). Thus, absolute immunity applies only when the acts at issue stem directly from the performance of "a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function." *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15. An SRO that would otherwise enjoy absolute immunity cannot claim that immunity when performing a non-governmental function. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15.

¶ 46 An SRO may undertake duties for reasons other than to further its governmental functions, such as when it acts for its own corporate benefit or to further a private purpose. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15. For example, an SRO's "efforts to increase trading volume" and thereby increase "company profit" are considered a non-governmental function. *Weissman*, 500 F.3d at 1297. When an SRO engages in nongovernmental functions, then a different rule of liability applies. The SRO is generally responsible for any injuries arising out of any negligent acts or omissions, to the same extent that a private corporation would be under the same circumstances. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15. As a clearing agency, defendant OCC charges clearing fees for contracts that are traded. The more contracts that it clears, the more fees it collects.[10] After paying for salaries, employee bonuses, and other operational expenses, OCC returns the excess of fees over expenses to its members. *Platinum Partners*, No. 10-CH-54472. For example, for fiscal year 2010, defendant OCC returned $38.4 million to its members.[11]

¶ 47 Although defendant OCC claims that it is a not-for-profit business,[12] in that it returns excess fees to its members, it admits in its brief to this court that its members were "for-profit businesses." Defendant argues that the fact that all its members were for-profit businesses has "no impact on OCC's non-profit status." However, defendant does not dispute that it had a bonus program for its employees based on the volume of its revenues. Jeffrey Huddleston, a help desk employee, testified at his deposition that the employees received bonuses "based on volume," which he explained was "the number of cleared contracts per year."

¶ 48 The test for whether an SRO's acts come under the umbrella of its regulatory immunity is objective. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 16. The subjective intent of the SRO's officers and employees is irrelevant. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 16. Immunity applies when a plaintiff's claims concern the exercise of powers that are within the scope of the governmental functions delegated to the SRO. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 16. Immunity depends *only* on whether the specific acts or omissions at issue were incidental to the exercise of these governmental functions. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 15. Since subjective intent is irrelevant, and immunity depends on only whether the specific acts or omissions were incidental to defendant's governmental functions,

---

[10]John Peplinski, the vice president of defendant's national operations group in December 2010, explained at his deposition: "[T]he revenue of OCC was determined by fees charged per contract cleared. So the more—the more—the more volume the—that we cleared, the more fees, we were able—you know, we—we got."

[11]Defendant OCC reported this amount in its publicly released 2010 annual report, which is also part of the record on appeal.

[12]Plaintiffs dispute defendant's status as a not-for-profit business but claim that, whether defendant is or is not, the issue is not defendant's status but whether it acted to further a governmental function.

what market participants, like plaintiffs, did know or should have known is irrelevant to the question of whether *defendant's* acts or omissions were entitled to regulatory immunity.

¶ 49 It is undisputed in the case at bar that an SRO, like defendant OCC, is immune from litigation for the *public* announcement of its regulatory decisions. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 17. Reporting its regulatory actions to the public is entirely consistent with the quasi-governmental powers that it exercises. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 17. Thus, the timing and method of these public announcements enjoys absolute immunity. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 17.

¶ 50 Applying the above principles to the facts at bar, this court previously found:

"In the case at bar, plaintiff concedes that the adjustment of IFN's strike price was a regulatory decision, serving to protect investors by compensation for the fact that the extraordinary distribution declared by IFN would reduce the value of the underlying IFN shares. However, while the price adjustment itself may have been a regulatory decision, the manner in which it was disclosed—privately and prematurely—to the John Doe defendants was not." *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 18.

¶ 51 In the above quote, when we found "that the manner in which it was disclosed—privately and prematurely—to the John Doe defendants was not" a regulatory decision, we were assuming the truth, as we had to at that time, of the factual allegations in the complaint, namely, that there were, in fact, disclosures made privately and prematurely to certain individuals. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 18. In the present appeal, the case has traveled further down the procedural timeline, and now we must consider whether the admissions, documents, and affidavits, which have since been made, produced, and sworn to, support this factual allegation. 735 ILCS 5/2-1005(c) (West 2016).

¶ 52 However, the public versus private distinction that we found in our prior opinion as a matter of law still applies. In our prior opinion, we explained:

"[D]efendants CBOE and OCC did not *publicly* announce this regulatory decision: the price reduction was privately disseminated only to certain market participants, and that disclosure did not serve any regulatory or governmental purpose. In addition to its quasi-governmental functions, defendants CBOE and OCC have a private, for-profit business, and in the private disclosure of the price-adjustment decision to the John Doe defendants, they were acting in their private capacity and for their own corporate benefit. Therefore, this nonpublic announcement cannot be construed as conduct under the delegated authority of the Securities Exchange Act of 1934 (15 U.S.C. § 78a (2010)) and thus cannot be protected by the doctrine of regulatory immunity." (Emphasis in original.) *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 18.

¶ 53 In the above quote, this court found that, "in the private disclosure of the price-adjustment decision," defendants "*were acting* in their private capacity and for their own corporate benefit." (Emphasis added.) *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 18. Interpreting this quote, the trial court created its own two-part test to determine whether immunity applied, which was (1) were the disclosures non-public and (2) if so, were they intended for defendants' " 'own corporate benefit.' " *Platinum Partners*, No. 10-CH-54472. Applying this test, the trial court found (1) nonpublic disclosures (2) but no intent to benefit defendant OCC. The trial court found no intent because (1) there was "no indication that [defendant] OCC precluded non-members from reaching out and obtaining the same information at issue," (2) defendant

OCC operated as a not-for-profit business,[13] and (3) there could have been no intent to benefit OCC since disclosures would have reduced trading.[14] *Platinum Partners*, No. 10-CH-54472. Thus, the trial court concluded that the doctrine of regulatory immunity applied and granted summary judgment for defendant OCC.

¶ 54    However, in our prior opinion, this court found that the test for whether an SRO's conduct falls within the scope of regulatory immunity is purely objective and that the subjective intent of the SRO is completely irrelevant. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 16. We articulated one and only one test for whether regulatory immunity applies: whether the specific acts and omissions were incidental to the exercise of the SRO's regulatory power. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 16. We concluded that "the manner" in which the price adjustment was disclosed, "privately and prematurely," was simply not a regulatory decision. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 18. Thus, the question became, as the case moved along the procedural timeline, whether subsequent discovery proved the allegations in plaintiffs' complaint that disclosures about the IFN's strike price were, in fact, made privately and prematurely.

¶ 55    On this appeal, defendant OCC argues that, in addition to proving that the disclosures were made privately and prematurely, plaintiffs should also be required to prove that the disclosures were made "selectively," to only defendant's own members. However, as we explained both above and in our prior opinion, "the manner" in which the price adjustment was disclosed, "privately and prematurely," to only certain individuals was simply not a regulatory decision, even if some of those individuals were not members. *Platinum Partners*, 2012 IL App (1st) 112903, ¶ 18. Providing this information—even if it just confirmed information that the caller already suspected—encouraged a caller to sell to individuals like plaintiffs who were buying, thereby generating more fees for defendant OCC. Defendant OCC forthrightly admits in its brief that callers to its help desk called seeking assurance that they were not missing anything, in light of plaintiffs' actions, and the help desk not only provided that assurance but confirmed that the price adjustment was anticipated or expected or going to happen. Assuming that the callers were not calling just to "waste away the hours," those calls could have helped generate more fees for defendant OCC and its officers and employees.

¶ 56    Defendant argues, in essence, that the official public announcement of the price adjustment was practically an irrelevancy, and it is the private calls that should be cloaked with regulatory immunity. We decline to so find. Announcing the price adjustment privately to only certain investors undermines the fairness of one official, public announcement for all. Whether or not the public announcement was proper, defendant is immune with respect to it—not so with private announcements to a few, limited participants. *Platinum Partners*, 2012 IL App (1st)

---

[13]The trial court did not explain why a not-for-profit business could not still act for its own corporate benefit and to enhance and further its own purpose—its own reason for existing.

[14]The trial court did not cite any evidence to support this assertion and did not explain why it believed that the disclosure of an anticipated price drop would not encourage market participants to sell to buyers, such as plaintiffs, at the temporarily elevated price. In its appellant brief, defendant argues that "the reason for the volume of trading on December 20" was the price plaintiffs were paying, rather than what defendant's employees stated to individual market participants. Defendant argues that, although its employees stated that a price drop was likely, there was no evidence that these statements increased trading, since "there was nothing said about whether or not to buy or sell the options."

- 11 -

112903, ¶ 16 (immunity does not depend on the propriety of the actions or omission but whether they were incidental to the SRO's governmental function).

¶ 57    Defendant argues on appeal that no matter what information the help desk employees pass along, their calls are entitled to regulatory immunity.[15] That claim cannot possibly be true, otherwise they could engage in insider trading with impunity.

¶ 58                          III. Supporting Documents and Affidavits

¶ 59    Next, we examine the admissions, documents, and affidavits submitted to us since our last opinion to determine whether defendant OCC satisfied its initial burden of showing the absence of evidence to support plaintiffs' allegations and whether plaintiffs have presented some evidence to support their own claims. *A.M. Realty*, 2016 IL App (1st) 151087, ¶ 86.

¶ 60    Almost three years after this court's last opinion, but a year before moving for summary judgment, defendants moved for leave to amend their answers to add the affirmative defense of regulatory immunity. In its proposed amended answer, defendant OCC admitted that some of its help desk employees disclosed pertinent information in private telephone conversations with certain market participants prior to a public announcement, including that an adjustment to the IFN strike price was "likely or anticipated." Defendant OCC admitted that these market participants called or emailed defendant OCC's help desk in response to the prices that plaintiffs were paying and in order to confirm that a downward adjustment would be made. However, in its proposed answer, defendant claimed that "OCC's Help Desk employees did not provide information concerning IFN *so that* OCC could profit from persons acting on that information." (Emphasis added.) As we already observed above, the subjective intent of defendant's employees is irrelevant to determining regulatory immunity. Defendant's motion for leave to amend, which was heard by a different trial judge, was denied. *Platinum Partners*, No. 10-CH-54472 (June 23, 2015). In denying the motion, the trial court observed that, based on the factual allegations made in its answer, defendant OCC's proposed amendment was futile. *Platinum Partners*, No. 10-CH-54472. We find that it was futile.

¶ 61    Since our last opinion, defendant OCC has produced audio recordings of its help desk employees privately disclosing to certain investors that defendant was about to adjust the strike price of the IFN option before that announcement was publicly and officially made. Individual callers were told that the adjustment was anticipated or expected or, flat out, that "there will be an adjustment." *Supra* ¶¶ 20-22. At their depositions, supervisors at defendant OCC testified that help desk employees were not authorized to disclose an adjustment prior to its official, public announcement. *Supra* ¶¶ 23-25. For example, John Peplinski, vice president of defendant OCC's national operations group testified that it was a clear "violation" of defendant's policy at the time. *Supra* ¶ 24. As a result, the employees involved received a written "warning" from their employer. *Supra* ¶ 25. In addition, Kenneth Rypel, a director of corporate actions, sent an email, prior to the public announcement, indicating an adjustment would be made. *Supra* ¶ 27. This evidence supports plaintiffs' prior factual allegations that defendant OCC made disclosures of the IFN strike price adjustment privately and prematurely

---

[15]Defendant's appellate brief argues that, "if the person is performing a regulatory function by answering questions at a help desk, regulatory immunity does not depend on the propriety of the answer." Hence, even if the help desk employee was providing "investment advice," defendant argues, the employee was still clothed with regulatory immunity.

to certain investors. In light of this evidence and other evidence like it, we must reverse the trial court's grant of summary judgment, which was based solely on the doctrine of regulatory immunity. As we previously held, defendant OCC's private and premature disclosures of the adjustment were not shielded from suit by regulatory immunity.

¶ 62                          IV. Plaintiffs' Motion for Summary Judgment

¶ 63    Defendant OCC asks, in the event that this court reverses the trial court's grant of summary judgment in its favor on the ground of regulatory immunity, that we decline to consider plaintiffs' cross-motion for summary judgment on the merits of their claims. In contrast, plaintiffs ask us to consider their cross-motion as well.

¶ 64    The trial court declined to consider the merits of plaintiffs' claims, deciding the case solely on the issue of regulatory immunity. As a result, its Rule 304(a) finding concerned only the grant of summary judgment to defendant.

¶ 65    "The denial of a summary judgment motion is not a final order and is normally not appealable even where the court has made a finding pursuant to Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016)." *Fogt v. 1-800-Pack-Rat, LLC*, 2017 IL App (1st) 150383, ¶ 95; *Eakins v. Hanna Cylinders, LLC*, 2015 IL App (2d) 140944, ¶ 36 ("A denial of a summary judgment motion is not a final order and is normally not appealable, even with Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) language."); see also *Clark v. Children's Memorial Hospital*, 2011 IL 108656, ¶ 119 ("the denial of summary judgment is not appealable, because such an order is interlocutory in nature").

¶ 66    Our supreme court has recognized an exception to this general rule, where cross-motions for summary judgment are filed, one party's motion is granted, and the trial court's "order disposes of all the issues in the case." *Clark*, 2011 IL 108656, ¶ 119; *Eakins*, 2015 IL App (2d) 140944, ¶ 36. However, the order in the case at bar did not dispose of or address all the issues in the case.

¶ 67    In addition, the order did not discuss the same claims or issues as those raised in plaintiffs' motion. "[R]eview of an order denying a motion for summary judgment is proper where the order also granted a cross-motion for summary judgment on the same claim or claims ***." *Wolfram Partnership, Ltd. v. LaSalle National Bank*, 328 Ill. App. 3d 207, 216 n.2 (2001); see also *In re Estate of Funk*, 221 Ill. 2d 30, 85 (2006) ("An exception *** has been recognized where cross-motions for summary judgment have been filed on the same claim and one party's motion is granted while the opposing motion is denied, thereby disposing of all issues in the case."). In the case at bar, defendant moved for summary judgment based on regulatory immunity, whereas plaintiffs moved for summary judgment based on the merits of their various fraud and securities violation claims.

¶ 68    Thus, we decline to review plaintiffs' cross-motion for summary judgment and remand for further proceedings consistent with this opinion.

¶ 69                                         CONCLUSION

¶ 70    For the foregoing reasons, we reverse the trial court's grant of summary judgment and remand for further proceedings consistent with this opinion.

¶ 71    Reversed and remanded.